[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-17285

_____

D.C. Docket No. 1:16-cr-20316-MGC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KEENAN JOYNER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 22, 2018)

Before MARCUS, FAY and HULL, Circuit Judges.

HULL, Circuit Judge:

Defendant Keenan Jermaine Joyner appeals his conviction and sentence after

a jury found him guilty of being a convicted felon in possession of a firearm and

ammunition.  On appeal, defendant Joyner argues that the district court's supplemental jury instruction did not adequately address the jury's question about possession of a firearm.  Joyner also contends that the district court erred in concluding that his prior Florida convictions for attempted strong arm robbery and resisting an officer with violence are "violent felonies" under the Armed Career Criminal Act ("ACCA").  After careful review, and with the benefit of oral argument, we affirm.

## I. BACKGROUND

On May 6, 2016, a federal grand jury indicted defendant Joyner on one count of possession of a firearm and ammunition by a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) & 924(e)(1).  Joyner pled not guilty, and the case proceeded to a jury trial beginning on August 29, 2016.

### A.    Evidence at Trial

At trial, the government presented four witnesses: Detective Martin Garcia, Detective Dustin James, crime scene technician Andrea Amy, and crime lab analyst Hali Meyer.

Detective Garcia testified as follows.  Garcia and other officers were conducting surveillance on a particular car, in connection with an ongoing

investigation.[1]  Defendant Joyner was not the registered owner of the car, and was not a subject of the ongoing investigation.

On the day in question, Detective Garcia and other officers were covertly observing the subject car, which was parked in a lot adjacent to a convenience store and laundromat.  One of the observing officers, Detective Dustin James, was the "eyeball" of the surveillance team, meaning that he maintained visual contact with the car at all times.  Garcia testified that when Detective James, the "eyeball," told the other officers over the radio that the car appeared to be occupied, all of the officers, including Garcia, began moving toward the car from their various positions.

As Detective Garcia approached, he saw two people standing in front of the car, one of whom was defendant Joyner.  When Joyner realized that police officers were approaching him, he ran from the front of the car to the driver's side door.  Joyner was "about 20, 25 feet" away from Garcia.  At that point, Garcia saw a firearm in Joyner's left hand, "as if he was withdrawing it from his waistband."  Garcia testified he was "[a]bsolutely 100 percent" certain he saw a firearm in Joyner's left hand.

Detective Garcia testified that when Joyner reached the driver's side door, he spun around, opened the door, dropped to one knee, and "slides the gun

---

[1]The investigation concerned an armed carjacking.  Detective Garcia did not testify about the subject of the investigation.

3

underneath the seat." Garcia did not see which hand Joyner used to open the car door. However, as far as Garcia could tell, the gun was in Joyner's left hand at all times.

Detective Garcia immediately radioed the code "55" to the other officers, which told the officers that a gun was present. The detectives moved in, and Joyner was "taken down." Approximately one minute later, after Joyner was in custody, Garcia looked inside the car and saw a firearm underneath the driver's seat. Later, when the firearm was collected from the scene, it was found to contain an ammunition magazine with eight live projectile cartridges.

The government's second eyewitness, Detective Dustin James, was the "eyeball." James testified that the car was parked in front of the laundromat and backed into a parking space, such that James's vantage point was from the front of the car. At a certain point, James saw two men, one of whom was Joyner, walking towards the car. One of the men—the one who was not Joyner—opened a car door on the passenger side and started loading bins of laundry into the car. The other man—Joyner—remained in front of the car, "basically looking around."

When Detective James saw Joyner and the other individual occupy the car, James radioed the other officers to take both men into custody. The officers converged on the car. James testified that as the officers approached the car, he saw defendant Joyner move from the front of the car to the driver's side and open

4

the driver's side door.  James heard Detective Garcia scream "55" as Joyner opened the door, which James understood to mean a gun was present.  However, because Joyner's back was to James as Joyner opened the car door, James never saw a gun in Joyner's hand.  James did not know which hand Joyner used to open the car door, but James "assum[ed]" that Joyner used his left hand.  James testified that he never saw Joyner bend down or put anything under the driver's seat.

The government's third witness, crime scene technician Andrea Amy, testified that she did not find any fingerprints on the gun or ammunition magazine recovered from the car.  However, Amy explained that "many factors" can affect whether a fingerprint is left on an item.  Amy further testified that after testing for fingerprints, she collected DNA swabs from the gun, the magazine, and the eight live projectile cartridges.  The swabs were then sent to the county DNA lab for analysis.[2]

The government's last witness, crime lab analyst Hali Meyer, testified that she tested the DNA swabs taken from the gun and magazine, but was unable to confirm that Joyner's DNA was present.  Meyer testified that there are "a lot of reasons" DNA might not be left behind after a person handles an object.

Joyner did not present any witnesses.  The parties stipulated that Joyner had a previous felony conviction and that the firearm he allegedly possessed affected

---

[2]During Amy's testimony, the government introduced the firearm and magazine with ammunition into evidence.  The firearm was a Sig Sauer .45 caliber handgun.

5

interstate or foreign commerce.  Thus, the only contested issue was whether Joyner possessed the firearm.

## B.    The Jury Charge

After the close of evidence, the district court excused the jury while the parties discussed the proposed jury instructions.  Among other things, the parties agreed to remove instructions concerning "several kinds of possession" and "constructive possession," but to leave in instructions regarding "actual possession" and "sole possession."

When the jury returned, the district court issued the instructions to the jury. The district court gave the charge verbally and in writing to the jury.  In relevant part, on page 10, the charge instructed that the government had to prove defendant Joyner "knowingly possessed" the firearm, stating:

> It's a Federal crime for anyone who has been convicted of a felony offense to possess a firearm and/or ammunition in or affecting interstate or foreign commerce.
>
> The Defendant can be found guilty of this crime only if all the following facts are proved beyond a reasonable doubt:
>
>> (1) the Defendant knowingly possessed a firearm and/or ammunition in or affecting interstate or foreign commerce; and
>>
>> (2) before possessing the firearm and/or

6

> ammunition, the Defendant had been convicted of a felony – a crime punishable by imprisonment for more than one year.

(emphasis added).

On page 11 of the charge, the district court instructed the jury about actual and sole possession, stating:

> "Actual possession" of a thing occurs if a person knowingly has <u>direct physical control</u> of it.
>
> "Sole possession" of a thing occurs if a person is the only one to possess it.

(emphasis added).  On page 12 of the charge, the district court told the jury the meaning of the word "knowingly," stating:

> The word "knowingly" means that an act was done voluntarily and intentionally and not because of a mistake or by accident.

## C.    Closing Arguments

Once the jury was charged, the parties presented their closing arguments. The government's argument focused on the concept of actual possession in a person's hand.  To illustrate how defendant Joyner knowingly possessed the firearm, counsel for the government held a pen in his hand.  Counsel explained that he was "possessing" the pen at that point.  Counsel then "[got] rid of" the pen by placing it underneath a lectern.  The government argued that the evidence established that defendant Joyner knowingly possessed the firearm in a similar

manner.  That evidence was Detective Garcia's testimony that he "saw the Defendant possessing that firearm first near his waistband, and then he testified he saw him put that firearm underneath the driver's seat of that car."  The government's theory was that Joyner possessed the firearm before he put it under the driver's seat.

The closing argument of defendant Joyner's counsel emphasized that Detective Garcia's testimony was the only evidence that Joyner possessed the gun. Defense counsel reminded the jury that the car, in which the gun was later found, was not registered to Joyner, and that Joyner was not involved in the crime for which the car was being investigated.  Defense counsel argued that Joyner "wasn't even the only person in the car," so that "any number of people" could have put the gun under the driver's seat.  Defense counsel characterized the government's physical evidence of possession as "[t]hree different people's DNA on a gun found in a car that wasn't [Joyner's]."

Defense counsel also argued that the testimonies of witnesses Garcia and James were inconsistent on certain points.  According to defense counsel, Garcia testified that Joyner held the gun in his left hand at all times, whereas James testified that Joyner opened the car door with his left hand.  In addition, Garcia said both Joyner and the other man were standing in front of the car when the officers

8

approached, whereas James said the second man was loading laundry into the back of the car.

In rebuttal, the government argued that if defendant Joyner was not guilty, then Garcia was either mistaken or a liar. The government also argued that because Joyner opened the driver's side door of the car and the firearm undisputedly was found underneath the driver's seat, "[e]ither this Defendant is the most unlucky human being I have ever met or he is guilty."

After both sides presented their closing arguments, the district court asked the parties, in a sidebar, if they had any objections to the jury instructions as read. Neither party objected. The district court then directed the jury to begin deliberations.

## D.   The Jury's Question

The jury deliberated for approximately three hours before submitting a question about actual possession as follows:

> Clarification regarding Possession:
> We hereby request further clarification of "Actual Possession" as defined in the Court's instructions to the jury. Please explain or provide additional clarification or explanation on "…knowingly has direct physical control of it.["] Clarify "direct" as it pertains to physical control. Furthermore, does possession imply or not imply possession of the vehicle [whether] "on" the vehicle or "in" the vehicle?

9

The district court discussed with the parties how to respond to the jury's question. The parties agreed the district court should tell the jury that possession of the car was not at issue, and that the only issue for the jury was whether defendant Joyner possessed the gun and ammunition.

But Joyner also asked that the district court further clarify to the jury that "[t]he mere fact that the gun was in the vehicle is not at issue in this case." Joyner argued that the government's theory of the case was that Joyner possessed the gun in his hand outside the car, and that without his requested clarification, the jury could find that Joyner possessed the gun merely based on its presence in the car.

Ultimately, the district court concluded that if the court referred the jury back to the existing written definitions of "actual possession" and "knowingly," the jury would understand that it must determine whether or not Joyner had actual possession of the firearm, and, if so, whether he possessed the firearm knowingly. The district court gave this written response to the jury, referring them back to those definitions and advising that possession of the vehicle was not an issue in the case and that the issue was whether Joyner possessed the firearm, as follows:

> The possession of the vehicle is not an issue in this case.
> The issue before you is whether Mr. Joyner possessed the firearm and ammunition.
> Please refer to page 11 of the instructions for the definition of possession.
> Please refer to page 12 of the instructions for the definition of "knowingly."

10

As recounted earlier, the district court's charge on page 11 instructed that actual possession of a thing occurs "if a person knowingly has direct physical control of it." The district court did not give Joyner's other requested clarification.

The jury deliberated for two more hours before retiring for the day without reaching a verdict. Deliberations resumed the following day, and the next afternoon, the jury returned a guilty verdict against defendant Joyner.

### E.    Sentencing

In its presentence briefing, the government argued that defendant Joyner qualified as an armed career criminal under the ACCA based upon these prior Florida felony convictions: (1) a 2005 conviction for resisting an officer with violence, in violation of Fla. Stat. § 843.01, (2) a 2009 conviction for attempted strong arm robbery, in violation of Fla. Stat. §§ 812.13(1), (2)(c), & 777.04, and (3) a 2009 conviction for possession of cocaine with intent to sell, manufacture, or deliver, in violation of Fla. Stat. § 893.13(1)(A)(1). Although Joyner acknowledged that under this Court's precedent his predicate convictions qualified, he preserved his objections to this enhancement.

With the ACCA enhancement, Joyner's advisory sentencing guidelines range was 235-293 months' imprisonment. The district court sentenced Joyner to 200 months' imprisonment, below the low end of the advisory guidelines range, followed by five years of supervised release.

11

Joyner appeals his conviction and sentence.  We start with the jury charge.

## II. COURT'S JURY CHARGE

We review a district court's response to a jury question for an abuse of discretion.  United States v. Lopez, 590 F.3d 1238, 1247 (11th Cir. 2009).  We also examine a district court's refusal to give a requested jury instruction for an abuse of discretion.  Id. at 1248.

When a jury requests supplemental instruction, a district court should answer "within the specific limits of the question presented" and resolve the jury's difficulties "with concrete accuracy."  United States v. Baston, 818 F.3d 651, 661, 663 (11th Cir. 2016) (quotations omitted).  District courts have considerable discretion regarding the extent and character of supplemental jury instructions, but the supplemental instructions cannot misstate the law or confuse the jury.  Lopez, 590 F.3d at 1247-48.  A district court has a "duty to guide the jury."  United States v. Anderton, 629 F.2d 1044, 1048 (5th Cir. 1980).

To determine whether the jury was misled or confused, we review supplemental jury instructions as part of the entire jury charge and in light of the indictment, evidence presented, and arguments of counsel.  Lopez, 590 F.3d at 1248.  We must have "a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations" before reversing a conviction on a

challenge to the jury charge.  United States v. House, 684 F.3d 1173, 1196 (11th Cir. 2012) (quotation omitted).

Here, the district court's original jury charge, which was given verbally and in writing, made clear that the issue was Joyner's actual and sole possession of the firearm.  The original charge was a correct statement of the law.  Indeed, the district court's instructions regarding actual possession and sole possession were verbatim the pattern jury instructions for those terms.  See Pattern Crim. Jury Instr. 11th Cir. S6 (Apr. 2016).  Neither party objected to the original jury charge, then or now.

Similarly, the evidence and closing arguments also made clear that the issue for the jury was whether defendant Joyner actually held the gun in his hand outside the car.  Detective Garcia's testimony centered on seeing Joyner holding the gun before placing it under the driver's seat of the car.  Witnesses Amy and Meyer testified about the physical gun and ammunition and whether forensic evidence could prove Joyner had held the gun in his hand outside the car.  The government's closing argument emphasized that Joyner possessed the gun in his hand outside the car.  Defense counsel's closing argument asserted that witness Garcia's testimony was the only evidence that Joyner possessed the gun.  And the government never tried to establish that the car belonged to Joyner such that anything found inside the car could be imputed to him.  To the contrary, the government made clear

through Garcia's testimony that the car was not registered to Joyner, and the government said during its closing argument that Joyner "[got] rid of" the gun when he placed it in the car.

Nevertheless, the jury's question does reflect a concern about possession of the car. The jury's question asked: "Furthermore, does possession imply or not imply possession of the vehicle [whether] 'on' the vehicle or 'in' the vehicle?" The question itself is confusing. It could be read to mean the jury wanted to know if actual possession of the gun also required that Joyner possessed the vehicle where the gun was found. On the other hand, Joyner argues the question could also be read to mean that the jury was deliberating whether Joyner could have possessed the gun merely by possessing the car. But the question does not mention the gun at all, and thus that is not necessarily what the question meant. At bottom, the question borders on being unintelligible.

In any event, the district court responded appropriately and adequately to the jury's question. The district court first reminded the jury that "[t]he possession of the vehicle is not an issue in this case," and that "[t]he issue before you is whether Mr. Joyner possessed the firearm and ammunition." The remainder of the district court's response referred the jury to its earlier written instructions, which defined actual possession on page 11 and knowingly on page 12. Nothing in the district court's response was a misstatement of the law. And the district court responded

14

to the jury's question "within the specific limits of the question presented." Baston, 818 F.3d at 663 (quotations omitted). Accordingly, the district court did not fail in its "duty to guide the jury." See Anderton, 629 F.2d at 1048.

Importantly too, the government never argued that Joyner possessed the gun by possessing the car. Rather, the government's theory was that Joyner actually possessed the gun in his hand outside the car and got rid of it by putting it in the car. No party mentioned "constructive possession," and the district court was wise to stick to actual possession and not inject the term "constructive possession" into the case. Even assuming arguendo, as Joyner argues, that the jury was confused about possession of the gun through possession of the car, the district court's response to the jury's question adequately addressed that confusion by making clear that possession of the car was not an issue but that possession of the gun was the issue—in other words, the jury should not consider possession of the car, but should decide whether Joyner possessed the gun.[3]

We also must reject Joyner's argument that the district court was required to say more to prevent the jury's possible confusion. This ignores that the district court had substantial discretion regarding the extent and character of its

---

[3]Joyner's requested instruction as phrased—"[t]he mere fact that the gun was in the vehicle is not at issue in this case"—was not correct in any event. This is because the fact that a gun was found in the car was relevant evidence that corroborated Garcia's testimony that Joyner held the gun outside the car and then opened the door and put the gun inside. If anything the district court's response—telling the jury not to consider possession of the car—was more beneficial to Joyner than harmful.

15

supplemental jury instruction, so long as its instructions adequately guided the jury and did not misstate the law or mislead the jury. Lopez, 590 F.3d at 1247–48. As noted above, the district court's response to the jury's question was a correct statement of the law and served to clarify the issue before the jury. Taking into consideration the jury instructions as a whole, the evidence presented, and the arguments of counsel, we have nothing near a "substantial and ineradicable doubt" that the district court misguided the jury. House, 684 F.3d at 1196 (quotations omitted). Accordingly, defendant Joyner has shown no error in the district court's supplemental jury instruction.

### III. SENTENCING UNDER THE ACCA

We review de novo constitutional sentencing issues, including the issue of whether a prior conviction qualifies as a "violent felony" under the ACCA. United States v. Harris, 741 F.3d 1245, 1248 (11th Cir. 2014); United States v. Canty, 570 F.3d 1251, 1254 (11th Cir. 2009).

### A.    The ACCA

Joyner does not dispute that he was a convicted felon and prohibited from possessing a firearm and ammunition. See 18 U.S.C. § 922(g). Under the ACCA, a defendant felon convicted of having a prohibited firearm and ammunition is subject to a mandatory minimum sentence of 15 years (180 months) if he has three prior felony convictions for a "violent felony" or a "serious drug offense." 18

U.S.C. § 924(e)(1).  In this appeal, Joyner argues that his prior convictions for resisting an officer with violence and attempted strong arm robbery are not violent felonies under the ACCA.[4]

A "violent felony" is any offense punishable by a term of imprisonment exceeding one year that:

> (i) has as an element the use, attempted use, or threatened use of physical force against the person of another; or
>
> (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

18 U.S.C. § 924(e)(2)(B).  The first prong of this definition is referred to as the "elements clause," while the second prong contains the "enumerated crimes" clause and, finally, what is commonly called the "residual clause."  United States v. Fritts, 841 F.3d 937, 939 (11th Cir. 2016).  Joyner's appeal concerns only the elements clause.  This is because neither Florida robbery nor resisting an officer with violence is an enumerated crime, and the Supreme Court struck down the ACCA's residual clause as unconstitutionally vague in Johnson v. United States, 576 U.S. ___, ___, 135 S. Ct. 2551, 2556-58, 2563 (2015).  Thus, we address whether Joyner's prior convictions for resisting an officer with violence and for

---

[4]Joyner does not dispute that his conviction for possession with intent to sell cocaine, in violation of Fla. Stat. § 893.13(1), is a serious drug offense under the ACCA.  In any event, this Court has held that a conviction under Fla. Stat. § 893.13(1), like Joyner's, qualifies as a "serious drug offense" under the ACCA.  United States v. Smith, 775 F.3d 1262, 1268 (11th Cir. 2014).

17

attempted strong arm robbery have "as an element the use, attempted use, or threatened use of physical force against the person of another" within the meaning of the ACCA.  18 U.S.C. § 924(e)(2)(B)(i).

## B.    Resisting an Officer with Violence

Florida Statute § 843.01 provides that any person who "knowingly and willfully resists, obstructs, or opposes any officer . . . in the lawful execution of any legal duty, by offering or doing violence to the person of such officer," is guilty of resisting an officer with violence.  Fla. Stat. § 843.01 (emphasis added). Florida courts have held that "violence is a necessary element of the offense" of resisting an officer with violence.  United States v. Hill, 799 F.3d 1318, 1322 (11th Cir. 2015) (citing cases); see also United States v. Romo-Villalobos, 674 F.3d 1246, 1248-51 (11th Cir. 2012) (concluding under the 2010 Sentencing Guidelines that a conviction under Fla. Stat. § 843.01 constitutes a crime of violence for purposes of the elements clause of U.S.S.G. § 2L1.2(b)(1)(A)(ii), which has the same language as the ACCA elements clause).  Accordingly, as this Court previously held in Hill, a Fla. Stat. § 843.01 conviction for resisting an officer with violence "categorically qualifies as a violent felony under the elements clause of the ACCA."  Id.

18

## C.     Attempted Strong Arm Robbery

Joyner also has a prior conviction for attempted strong arm robbery, in violation of Fla. Stat. §§ 812.13(1), (2)(c), & 774.04.  Section 812.13(1) defines "robbery" as "the taking of money or other property . . . from the person or custody of another . . . when in the course of the taking there is the use of force, violence, assault, or putting in fear."  Fla. Stat. § 812.13(1).  Subsection (2)(c) of the statute provides that "[i]f in the course of committing the robbery the offender carried no firearm, deadly weapon, or other weapon," then the robbery is a second degree felony.  Id. § 812.13(2)(c).

As to attempt, Florida Statute § 777.04 provides that "[a] person who attempts to commit an offense prohibited by law and in such attempt does any act toward the commission of such offense, but fails in the perpetration or is intercepted or prevented in the execution thereof, commits the offense of criminal attempt."  Fla. Stat. § 777.04(1).  Under Florida law, the government must prove the existence of an overt act as necessary to support a conviction for attempt.  See Thomas v. State, 531 So. 2d 708, 709-10 (Fla. 1988).

In United States v. Lockley, this Court examined the elements of a robbery offense under Fla. Stat. § 812.13, and held that a Florida conviction for attempted robbery, without the use of a weapon, categorically qualified as a "crime of violence" under the career offender sentencing guideline at U.S.S.G. § 4B1.2(a),

19

which has the same elements clause as the ACCA.  632 F.3d 1238, 1240, 1242-43, 1245 (11th Cir. 2011).  In reaching this conclusion, the Lockley Court pointed out that robbery under Fla. Stat. § 812.13(1) "necessarily requires" that the defendant (1) take money or property of some value from another person, (2) with the intent to permanently or temporarily deprive the person of that money or property, (3) by "using force, violence, or an intentional threat of imminent force or violence against another coupled with an apparent ability to use that force or violence, or by causing the person to fear death or great bodily harm."  Id. at 1242-43 (evaluating Fla. Stat. § 812.13(1)).  The Lockley Court also determined that "[t]hese elements hew almost exactly to the generic definition of robbery."  Id. at 1243.

Given these elements, the Lockley Court further concluded that Florida robbery (1) thus involves either the use or threatened use of physical force, or "some act that puts the victim in fear of death or great bodily harm," and (2) therefore "has, as an element, the 'use, attempted use, or threatened use of physical force against the person of another.'"  Id. at 1245 (citing U.S.S.G. § 4B1.2(a)(1)).  As such, the Lockley Court held that a Florida conviction for attempted robbery categorically qualified as a crime of violence under the elements of even the least culpable of these acts criminalized by Fla. Stat. § 812.13(1).  Id.

The Lockley Court further noted that Florida's attempt statute in Fla. Stat. § 777.04 "falls within the generic, contemporary meaning of attempt" because it

20

requires that the defendant commit an overt act, beyond mere preparation, in furtherance of the commission of the offense.  Id. at 1245 n.6.  As to attempt, this Court also reasoned as follows:

> Florida's attempt statute is therefore a close analogue to the Model Penal Code definition of attempt, as both require an "overt act"—meaning an act or omission—which clearly signals the commission of the offense instead of mere preparation.  Compare [Morehead v. State, 556 So. 2d 523, 524 (Fla. Dist. Ct. App. 1990)] . . . with United States v. Ballinger, 395 F.3d 1218, 1238 n.8 (11th Cir. 2005) (en banc) ("A substantial step must be more than remote preparation, and must be conduct strongly corroborative of the firmness of the defendant's criminal intent." (internal quotation marks omitted)).  Section 777.04(1) thus falls within the generic, contemporary meaning of attempt.

Id.

In challenging the use of his attempted strong arm robbery conviction as an ACCA predicate, defendant Joyner does not focus so much on the attempt aspect of his robbery conviction.  Rather, Joyner argues that the underlying substantive offense of strong arm robbery does not qualify as a violent felony because it does not involve the requisite degree of force.  But, as he acknowledges, Joyner's arguments concerning attempted strong arm robbery are foreclosed by Lockley, as well as our other precedent following Lockley.  See Fritts, 841 F.3d at 940, 942 (involving an ACCA case but following Lockley, a guidelines case, because the ACCA's elements clause is identical, and concluding that nothing in Curtis

21

Johnson[5] undermines our precedent in Lockley about Florida robbery); see also United States v. Seabrooks, 839 F.3d 1326, 1341 (11th Cir. 2016) (following Lockley and concluding that a Florida armed robbery conviction qualified as a violent felony under the ACCA); United States v. Dowd, 451 F.3d 1244, 1255 (11th Cir. 2006) (holding, "without difficulty," that a Florida conviction for armed robbery was "undeniably a conviction for a violent felony" under the ACCA's elements clause).  Based on our precedent, we conclude that Florida attempted robbery is categorically a violent felony under the ACCA.

## D.    Prior Convictions Not Charged in Indictment

Defendant Joyner argues that his ACCA sentence is unconstitutional because he was subjected to increased statutory penalties based on prior Florida convictions that were neither alleged in the indictment nor proven to the jury.  But the Supreme Court has explained that a statutory penalty provision, like the ACCA, "simply authorizes a court to increase the sentence for a recidivist," and "does not define a separate crime."  Almendarez-Torres v. United States, 523 U.S. 224, 226, 118 S. Ct. 1219, 1222 (1998).  "Consequently, neither the statute nor the Constitution requires the Government to charge the factor that it mentions"—Joyner's prior

---

[5]Curtis Johnson v. United States, 559 U.S. 133, 130 S. Ct. 1265 (2010).

convictions—"in the indictment."[6] Id. at 226-27; see also United States v. Sparks, 806 F.3d 1323, 1350 (11th Cir. 2015). In addition, a defendant's recidivism is not an element of his crime, and therefore need not be proven beyond a reasonable doubt. See Almendarez-Torres, 523 U.S. at 247, 118 S. Ct. at 1232-33.

### III. CONCLUSION

For all of the above reasons, we conclude that the district court did not err in its supplemental jury instruction or in declining to give the additional instruction requested by defendant Joyner. We also hold that Joyner's prior felony convictions for resisting an officer with violence and attempted strong arm robbery qualified as crimes of violence under the ACCA. We therefore affirm Joyner's conviction and sentence.

**AFFIRMED.**

---

[6]Joyner has never disputed that he in fact has these three prior Florida convictions. The government submitted, and the record contains, certified copies of his convictions. Joyner's claim is as to the indictment.

23