[DO NOT PUBLISH]

[REDACTED]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 18-12888

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

HENRY DE JESUS LOPEZ LONDOÑO,
a.k.a. Mi Sangre,
a.k.a. Salvador,
a.k.a. Carlos Mario,
a.k.a. Brother,
a.k.a. Krackin,
a.k.a. Federico,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:10-cr-20763-JAL-1

_____

Before ROSENBAUM, NEWSOM, and GRANT, Circuit Judges.

PER CURIAM:

Defendant-Appellant Henry De Jesus Lopez Londoño was extradited from Argentina to the United States and found guilty of conspiracy to distribute five or more kilograms of cocaine intending for it to be unlawfully transported into the United States, in violation of 21 U.S.C. §§ 959(a)(1), 960(b)(1)(B), and 963. Londoño appeals his conviction.

He contends that he worked with the United States Government as a confidential informant while in South America. And in that capacity, he says, he infiltrated a drug-trafficking organization. As a result, Londoño urges, he is entitled to the public-authority defense under Federal Rule of Criminal Procedure 12.3(a)(1) and an innocent-intent defense.

After careful review of the record and with the benefit of oral argument, we reject each of Londoño's claims of error and affirm his conviction.

# I.    Background

A.    General Factual Background[1]

Londoño was born in Medellin, Colombia. In the early 2000s, Londoño was a member of the Autodefensas de Colombia ("AUC"), an umbrella organization of right-wing paramilitary groups. After the AUC was disbanded, in around 2005, Londoño demobilized from the AUC. He later fled Colombia and established residency in Argentina in 2007.

While in Argentina, Londoño contacted the head of the Urabeños, a paramilitary organization based in the Uraba region in Colombia. He later met in person with high-ranking members of the Urabeños in Colombia. The Urabeños were heavily involved in drug trafficking. They financed their operations by "taxing" traffickers who moved cocaine through the northern coastline of Colombia to Mexico and the United States.

Although the parties dispute the timing, they agree that, at some point, Londoño met with leaders of the Urabeños, who approved his entry into the organization. Initially, the Urabeños tasked Londoño with organizing several cells of their organization in the Medellin area. Later, they gave him a leadership role.

Londoño says he infiltrated the Urabeños as a Government informant. And in that capacity, he asserts, the Government

---

[1] This factual background comprises a summary of the relevant trial testimony.

authorized him to commit the crimes of which he was later accused. The Government disagrees. It says Londoño's membership in the Urabeños pre-dated his brief time as an informant, and the Government did not authorize Londoño's criminal activities during that time.

B.    Pretrial Proceedings

On February 10, 2012, a grand jury for the Southern District of Florida returned a superseding indictment charging Londoño and six co-defendants with a single count of conspiracy to distribute five or more kilograms of cocaine with the intent that the cocaine be imported into the United States, in violation of 21 U.S.C. §§ 959(a)(1), 960(b)(1)(B), and 963. The superseding indictment alleges a conspiracy beginning in October 2006 and continuing through 2012.

In October 2012, Londoño was arrested in Argentina. At that time, authorities seized several documents, including identification documents in a different name.

Londoño remained incarcerated in Buenos Aires until at least May 2016, when Argentina granted the Government's request for extradition to try Londoño "for Count One [of the superseding indictment] concerning the crime of combination for unlawful purposes or conspiracy to distribute a controlled substance (five kilos or more of cocaine), knowing said substance would be illegally imported into the United States."

Shortly after his arrival in the United States, Londoño filed two documents alerting the district court and the Government about his defenses.

First, he filed a notice of his intent to rely on a public-authority defense under Rule 12.3, Fed. R. Crim. P.[2] In that filing, Londoño asserted that he acted under public authority from October 2008 through December 2011. He said he communicated with the Drug Enforcement Agency ("DEA") and Immigrations and Customs Enforcement ("ICE"). As for law-enforcement agents involved in his defense, Londoño named Steven Monks (ICE), Frank Burrola[3] (ICE), Alex Navarro (DEA), Jorge Rodriguez (DEA), and another DEA agent named Fernando.

Second, invoking *Brady v. Maryland*, 373 U.S. 83 (1963), Londoño filed a demand for the Government to produce materially favorable evidence about his public-authority defense.

Londoño later filed several pretrial motions. Among these were motions to dismiss the indictment based on the Government's alleged destruction of exculpatory evidence and motions

---

[2] Under Rule 12.3(a)(1), Fed. R. Crim. P., "[i]f a defendant intends to assert a defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense, the defendant must so notify an attorney for the government in writing and must file a copy of the notice with the clerk within the time provided for filing a pretrial motion, or at any later time the court sets."

[3] The filing incorrectly refers to Agent Burrola as "Agent Barolo."

for production of *Brady* material supporting Londoño's public-authority defense, including a confidential informant's file.

The district court referred the motions for production of *Brady* material to a magistrate judge who conducted an *in camera* inspection of documents that the Government asserted were confidential or of a sensitive nature. To allow the magistrate judge to consider the motions, the Government provided two sets of documents responsive to discovery: a redacted set (which it had given Londoño) and an unredacted set. The magistrate judge agreed that the Government was correct in giving the redacted set of documents to Londoño because the "vast majority of" documents contained "no[] or few redactions." After reviewing the unredacted set, the magistrate judge concluded that the Government need not produce unredacted documents.

As for the motions to dismiss, Londoño argued that (1) the Government destroyed five BlackBerry phones that law-enforcement agents used to communicate with Londoño during his cooperation, and (2) the Government falsely denied that Agent Burrola had communicated with Londoño by email and then destroyed those emails and disabled the email account.

In response, the Government acknowledged that it had created an email account for Agent Burrola and Londoño to communicate. But, the Government said, Agent Burrola never actually communicated with Londoño by email, so no emails were destroyed. Rather, the Government claimed Agent Burrola communicated with Londoño by BlackBerry Messenger. The Government

also asserted the law-enforcement agents turned in the BlackBerrys they had used, but because of a department-wide upgrade (and not for any nefarious reason), the Government had destroyed them.

The district judge referred the motions to dismiss to a magistrate judge, who held an evidentiary hearing. At the hearing, Londoño testified that during a meeting with Agent Burrola, Burrola gave him a business card on which he wrote a "live.com" email address and a password. Londoño said he communicated with Agent Burrola through this email account through "draft" emails that neither he nor Burrola ever actually sent. According to Londoño, the two would compose drafts of emails, and each could access the saved drafts by logging into the email account with the password.

Agent Burrola conceded that he had provided Londoño with a business card with the "live.com" email address. But he claimed he never communicated with Londoño through that email. Instead, he said any communication occurred through BlackBerry Messenger. In any event, the "live.com" email was later disabled.[4]

After the evidentiary hearing, the magistrate judge issued a lengthy report and recommendation ("R&R") recommending that the district court deny Londoño's request for dismissal of the claims based on destruction of evidence. Still, the magistrate judge

---

[4] Agent Burrola confirmed the existence of a response from Microsoft in connection with the subpoena for records for the "live.com" email address. The response was that the account did not now exist and there was no user at that location.

recommended that the parties be permitted to present evidence at trial about the communications by BlackBerry, the purported communications by email, and the circumstances surrounding the absence at trial of the BlackBerrys and emails. The district court later overruled Londoño's objections to the R&R and denied the motions to dismiss. It reserved ruling on a request Londoño made for an adverse-inference jury instruction based on the Government's destruction of evidence.

Londoño proceeded to trial. At trial, the parties presented competing testimony about the use of emails between Londoño and Agent Burrola, and the jury was able to consider that evidence.

C.    Trial

Londoño's trial began on February 7, 2018. We don't recite the extensive evidence the parties presented at trial because it's not necessary to address the issues before us. And Londoño doesn't challenge the sufficiency of the evidence against him on the sole conspiracy count.

Overall, the Government put on evidence of a large-scale drug-trafficking operation. It asserted that Londoño was a conspirator in that operation and was not entitled to the public-authority defense. We provide a very brief summary.

The Government presented several witnesses, and its case consisted of two types of evidence. First, the Government put on the testimony of law-enforcement witnesses and their confidential informants. These five witnesses gave the details of the inception, development, and termination of cooperation agreements

between ICE, the DEA, and the Internal Revenue Service ("IRS"), and Londoño from late 2008 through February 2011. Among the agents who testified were ICE Agent Monks, DEA Agent Rodriguez, and IRS Agent Santiago Aquino.

The Government also presented evidence to negate Londoño's public-authority defense. This evidence included testimony from Londoño's accomplices or associates. These individuals described the criminal activities Londoño allegedly engaged in while he claimed he was actively working for the Government. In all, fifteen witnesses who cooperated with the Government testified about Londoño's efforts to smuggle cocaine into the United States.

For its part, the defense called seven witnesses, including Londoño, who testified in support of his public-authority defense. Roberto Luna, a confidential informant for the IRS and DEA, testified during the defense case about his involvement in arranging for Londoño's cooperation with the Government. A few of Londoño's attorneys—Luis Lopera, Erik Sunde, and John Villamil—also testified about their part in Londoño's efforts to cooperate with the Government and their actions taken after Londoño's arrest. Besides these witnesses, Londoño called ICE Agent Burrola to the stand to discuss how he communicated with confidential informant Sergio Adame about evaluating Londoño. Agent Burrola also testified about his communications with Londoño by BlackBerry Messenger.

During the Government's rebuttal case, Sergio Adame and Roberto Luna (both confidential informants) took the stand. DEA Agent Fernando Plascencia also testified, and the government recalled to the stand Londoño's attorney Erik Sunde.

At the end of the trial, Londoño repeated his request for an adverse-inference instruction based on the Government's destruction of the BlackBerry phones and the deletion of the email that Agent Burrola created. The district court denied the request for the instruction.

Ultimately, after about a month of testimony, the jury found Londoño guilty of conspiring to distribute five or more kilograms of cocaine with the intent that it be imported into the United States in violation of 21 U.S.C. §§ 959(a)(1), 960(b)(1)(B), and 963.

D.    Post-Trial Proceedings

After trial, Londoño filed a motion for acquittal, a renewed motion to dismiss, and a motion for new trial, all of which the Government opposed. The district court denied each of the motions.

Londoño also sought the release of the unredacted form of the documents the Government had produced in redacted form during discovery. During the pendency of this appeal, the Government inadvertently provided defense counsel with sealed ex parte pleadings. Some of these documents contain unredacted versions of documents the Government had previously produced in redacted form to Londoño. Londoño now claims the Government committed *Brady* violations by failing to produce some of the

18-12888                Opinion of the Court                11

redacted information. He raises this argument for the first time on appeal.

The district court sentenced Londoño to 372 months' imprisonment. He now appeals, raising several grounds.

## II.    **Discussion**

Londoño raises five primary claims on appeal. First, he contends that the Government's destruction of evidence violated his due-process rights. Second, he asserts the district court abused its discretion when it excluded certain evidence at trial. Third, he argues that the district court erred when it failed to give an adverse-inference instruction to the jury about the destruction of evidence and when it answered a question the jury asked during deliberations. Fourth, Londoño says the Government's prosecution of him violated the rule of specialty. And fifth, he asks us to find that the Government violated its duty to disclose *Brady* material, including the unredacted documents the defense reviewed after trial. We address each claim in turn.

A.    The Government's destruction of evidence did not violate Londoño's due-process rights.

Londoño first asks us to vacate his conviction and dismiss the superseding indictment or grant him a new trial because he says the Government violated his due-process rights. Londoño takes aim at the Government's destruction of evidence Londoño claims would have bolstered his public-authority and innocent-intent defenses. In support of his argument, Londoño points to (1) the destruction of BlackBerry phones containing BlackBerry Messenger

messages and other electronic communications between Government agents, and (2) the deactivation of a specially created email account that Agent Burrola set up to securely communicate with Londoño.

The district court's determination that the Government didn't violate Londoño's due-process rights by failing to preserve and produce this evidence presents a mixed question of fact and law. *See United States v. Revolorio-Ramo*, 468 F.3d 771, 774 (11th Cir. 2006). So we review the district court's findings of fact for clear error and its legal conclusions *de novo*. *Id*. (citing *United States v. Brown*, 9 F.3d 907, 910 (11th Cir. 1993)).

Here, no one seems to dispute the facts, so we focus on the district court's legal conclusion that the destruction of evidence was not a due-process violation. We conclude that the Government did not violate Londoño's rights to due process. For that reason, we reject Londoño's claim.

*1.    To prove a due-process violation, Londoño must show either that the exculpatory value of the evidence was apparent at the time it was destroyed and that he could not have obtained equivalent evidence elsewhere; or that the evidence was potentially exculpatory and that the Government acted in bad faith when it destroyed the evidence.*

The parties dispute the legal test we must apply to our determination of whether a due-process violation occurred. Londoño argues that, to establish a due-process violation, he need not show that the government acted in bad faith when it destroyed

the evidence. In Londoño's view, *California v. Trombetta*, 467 U.S. 479 (1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988), support his contention.

The Government takes the opposite position. It asserts that Londoño cannot make out a due-process violation unless he shows the Government destroyed the evidence in bad faith. For support, the Government points to our decision in *Revolorio-Ramo*.

The relevant legal test depends on how we categorize the destroyed evidence. If the exculpatory value of the evidence was constitutionally material, Londoño need not show that the Government destroyed the evidence in bad faith. *See Trombetta*, 467 U.S. at 488–89. To be constitutionally material, Londoño must show that the evidence possessed an exculpatory value that was "apparent" before it was destroyed and that he could not have obtained equivalent evidence elsewhere. *Id.* But if the evidence was only "potentially" exculpatory, Londoño must show that the Government destroyed the evidence in bad faith in order to establish a due-process violation. *See Youngblood*, 488 U.S. at 57–58; *Revolorio-Ramo*, 468 F.3d at 774–75. These legal standards derive from the Supreme Court's holdings in *Trombetta* and *Youngblood,* as well as our decision in *Revolorio-Ramo*. A discussion of these cases is helpful.

*Trombetta* involved a drunk-driving prosecution. *Trombetta*, 467 U.S. at 481. There, the defendants sought to suppress their breathalyzer-test results. *Id.* at 482. They argued that the tests' use violated the defendants' due-process rights because the state had not preserved the breath samples supporting the results. *Id.* at 482-

14                      Opinion of the Court                    18-12888

83, 491. The Supreme Court disagreed. It held that due process did not require law-enforcement agencies to preserve breath samples and that the government did not violate the defendants' rights. *Id.* at 491.

In reaching this decision, the Court concluded that the government must preserve only constitutionally material evidence— that is, "evidence that might be expected to play a significant role in the suspect's defense." *See id.* at 488. The Court further explained that evidence is constitutionally material only if it meets two requirements: (1) its "exculpatory value" was "apparent" before destruction, and (2) the defendant was unable to obtain "comparable evidence by other reasonably available means." *Id.* at 489.

As these factors played out in *Trombetta*, the Court noted that the breath samples were only "potentially" exculpatory since they were more likely to provide inculpatory evidence and it was not clear whether further testing of the samples would have supported the defense. *Id.* at 481, 489. The Court also noted that the defendants had other means to challenge the breathalyzer test results. *Id.* at 490. As a result, the Court determined that the evidence wasn't constitutionally material. *Id.* at 489–90. But the Court also found significant that the officers had acted in good faith and followed usual practices in destroying the evidence. *Id.* at 488. So the record contained no suggestion of animus or an effort to withhold exculpatory evidence. *Id.*

Then in *Youngblood*, the Supreme Court reaffirmed these principles, distinguishing between evidence that possibly could

have exonerated the defendant and evidence where the exculpatory value was apparent. *See Youngblood*, 488 U.S. at 56 n.⋆. There, law enforcement failed to ref rigerate clothing it collected from a child rape victim. *Id.* at 53. Because of this failure, certain forensic tests on semen stains on the clothing could not be performed at a later date. *Id.* at 53–54. At trial, the defendant argued that the child had wrongly identified him as his rapist. *Id.* at 54. And both the defendant's expert witness and the state's expert witness testified about what tests "might" have revealed had the evidence been properly preserved. *Id.* The trial court instructed the jury that it could draw an adverse inference against the state under the circumstances, but the jury found the defendant guilty. *Id.*

The Arizona Court of Appeals reversed the conviction on the ground that the destruction of potentially exculpatory evidence violated due process. *Id.* But the Supreme Court reversed. It held that the state's failure to preserve potentially useful evidence doesn't violate due process unless the defendant shows that the state acted in bad faith. *Id.* at 58. And the Court said that the question of bad faith turns on whether the state knew that the evidence was exculpatory at the time of destruction. *Id.* at 56 n.⋆ (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). In *Youngblood*, the record contained no suggestion of bad faith, so the Court found no violation of due process. *Id.* at 58.

A few years later, the Supreme Court clarified that the same burden does not apply for defendants who can show that the destroyed evidence was plainly exculpatory at the time it was

destroyed: the "applicability of the bad-faith requirement in *Youngblood* depended not on the centrality of the contested evidence to the prosecution's case or the defendant's defense, but on the distinction between 'material exculpatory' evidence and 'potentially useful' evidence." *Illinois v. Fisher*, 540 U.S. 544, 547–49 (2004) (per curiam). This difference in treatment is partly because when "potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Youngblood*, 488 U.S. at 57–58 (quoting *Trombetta*, 467 U.S. at 486). When material exculpatory evidence is withheld—that is, evidence with manifest exculpatory value that the defendant has no other way to obtain—the government's good or bad faith is irrelevant to the due-process analysis. *See id.* at 57; *see also Trombetta*, 467 U.S. at 489.

That leads us to our decision in *Revolorio-Ramo*. There, we held that, to prove that the government violated a right to due process when it destroyed evidence, the defendant must show that the evidence "was likely to significantly contribute" to his defense. *Revolorio-Ramo*, 468 F.3d at 774 (quoting *Trombetta*, 467 U.S. at 488). And to meet this standard of "constitutional materiality," the defendant must show (1) the exculpatory value of the evidence was "apparent before" the government destroyed the evidence; and (2) he was "unable to obtain comparable evidence by other reasonably available means." *Id.* (quoting *Trombetta*, 467 U.S. at 489).

We went on to explain that a failure to preserve "potentially useful evidence" doesn't violate due process unless the defendant

shows that the government destroyed the evidence in bad faith. *Id.* (internal quotation marks omitted) (quoting *Fisher*, 540 U.S. at 547-48, in turn, quoting *Youngblood*, 488 U.S. at 58).

Before setting out these standards though, we noted that the evidence destroyed in *Revolorio-Ramo* was only "potentially exculpatory," so we applied the bad-faith requirement. *Id.* And there, because no evidence suggested that the failure to preserve evidence stemmed from bad faith, no due-process violation occurred. *Id.* at 775.

In sum, under *Trombetta*, *Youngblood*, *Fisher*, and *Revolorio-Ramo*, it matters whether the evidence is constitutionally material or whether the evidence is only potentially exculpatory. If the evidence was constitutionally material, the Government's good or bad faith is irrelevant. *See Trombetta*, 467 U.S. at 488–89. So to establish a due-process violation, Londoño must show that the evidence had an exculpatory value that was "apparent" before it was destroyed and that he could not have obtained equivalent evidence elsewhere. On the other hand, if the evidence was only "potentially" exculpatory, Londoño must show that the Government destroyed the evidence in bad faith. *See Youngblood*, 488 U.S. at 57–58; *Fisher*, 540 U.S. at 547–49; *Revolorio-Ramo*, 468 F.3d at 774–75.

2.     *Regardless of whether the evidence was constitutionally ma- terial or only potentially exculpatory, no due-process violation oc-*

*curred here.*

We assume without deciding that the destroyed evidence had at least some exculpatory value. After all, if BlackBerry

Messenger messages and emails between Londoño and Burrola ever existed, they would have likely shown if and how Londoño was cooperating with the Government.[5]

But we conclude that Londoño cannot show a due-process violation regardless of whether the destroyed evidence was constitutionally material or only potentially exculpatory.

### a.    Even assuming the destroyed evidence was constitutionally material, Londoño cannot show a due-process violation.

We've already established that, to be constitutionally material, the exculpatory value of the evidence had to be "apparent" before the Government destroyed it and deactivated the account in 2012.  Londoño argues that it was.  In support, he points to an email exchange dated October 14, 2010.



---

[5] The Government does not strongly contest this.  And it concedes that it communicated with Londoño through BlackBerry Messenger and email from late 2009 through 2010.



Of course, these emails themselves aren't an admission that the Government knew that its agents in fact possessed information relevant to Londoño's public-authority defense. After all, that is what the emails were seeking to learn. Still, the emails do show that the Government recognized that Londoño might seek to put on a public-authority defense—that is, that evidence supporting a public-authority defense for Londoño (if any existed) would be exculpatory. But that doesn't establish that any such evidence had an exculpatory value that was "apparent" to the Government before

it was destroyed. Indeed, nothing in the record suggests that the agents knew any of their communications with Londoño were exculpatory.

But even assuming for purposes of this opinion that the exculpatory value of the destroyed evidence was "apparent" to the Government before destruction, Londoño hasn't established that he wasn't able to obtain "comparable evidence by other reasonably available means." *Revolorio-Ramo*, 468 F.3d at 774.

Londoño says he had no other means available to him to obtain evidence comparable to the destroyed evidence. He points out that only two of the BlackBerry phones he used to communicate with ICE and Sergio Adame still exist, that only one phone contains any valuable information, and that only a "small fraction" of that information was recovered for trial. And he asserts that he couldn't preserve any of the other BlackBerry phones or communications because he feared for his security and life.

But the problem for Londoño is that the record doesn't bear him out. Londoño had equal access to all the alleged communications. The crucial evidence here was communications between Londoño and Government agents or confidential informants. And Londoño, of course, directly participated in the communications. So at least at some point, Londoño had access to the same evidence he claims the Government possessed.

Not only that, but Londoño never explains why he didn't forward his communications to his attorneys, save these particular messages, or find some mechanism to preserve his own BlackBerry

phones. His actions are surprising because the Government advised Londoño (through his counsel) that it was important that he keep copies of the communications with the agents. Londoño's failure to save evidence is also peculiar because he *did* save other information.

To be sure, Londoño suggests that he didn't preserve these communications because he feared for his safety. And we could see how that could, on another record, perhaps warrant a finding of unavailability.

But it doesn't here. At the same time Londoño chose not to forward or copy his communications with the Government, he possessed other evidence—such as BlackBerry messages in the notes section of his phone and Burrola's business card—that also would have threatened his safety. But that didn't stop Londoño from maintaining it. Nor has Londoño explained why he could retain that information but not the information he seeks here. So we must wonder why Londoño selectively retained only some information. And that makes it hard for us to conclude that the destroyed evidence was "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Revolorio-Ramo*, 468 F.3d at 774.

So here, even assuming that the evidence had an exculpatory value that was "apparent" to the Government before it was destroyed—a decision we don't reach—Londoño cannot establish constitutional materiality because he was able to obtain comparable evidence, if not the same evidence, through his own means.

>    b.    If the destroyed evidence was only "poten-
> tially" exculpatory, Londoño also cannot show a due-
> process violation.

Alternatively, if we find the destroyed evidence to be only "potentially" exculpatory, Londoño still can't establish a violation of his due-process rights because he hasn't shown bad faith on the part of the Government.

To establish bad faith, Londoño argues that, when Agent Goumenis sent the October 14, 2010, email, all allegedly exculpatory communications existed and were stored on the BlackBerry phones (that Agents Burrola, Monks, and Plascencia possessed), the email account that Burrola created, and Adame's electronic devices. Based solely on this circumstance and the fact that the Government later destroyed this evidence, Londoño contends that the Government acted in bad faith. But this record doesn't allow us to draw that conclusion.

First, nothing in the Goumenis email suggests a plan for the Government to destroy evidence. To the contrary ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Nor does anything else in the record suggest that the Government sought to destroy the evidence to prevent Londoño from accessing it. Not only that, but the agents also knew Londoño had equal access to the communications.

And second, the Government showed that it destroyed and replaced the BlackBerry phones as a routine matter—because of a department-wide upgrade—not to prevent Londoño from

accessing the messages on the phones. This Court and others have regularly held that the government does not act with bad faith when it destroys evidence in its normal or routine practice. *See Brown*, 9 F.3d at 910 (no bad faith where weapon seized was later destroyed per standard policy of police department); *see also United States v. Wilchcombe*, 838 F.3d 1179, 1191-92 (11th Cir. 2016) (typical and reasonable law enforcement decision does not permit inference of bad faith); *United States v. Garza*, 435 F.3d 73, 75-76 (1st Cir. 2006) (evidence destroyed in course of routine procedure weighs against finding of bad faith); *United States v. Gomez*, 191 F.3d 1214, 1219 (10th Cir. 1999) (destruction of evidence pursuant to established procedure precludes finding of bad faith without other compelling evidence); *United States v. Femia*, 9 F.3d 990, 995 (1st Cir. 1993) (routine destruction of audio tapes was not bad faith).

Londoño responds by saying Agent Burrola's testimony that he did not communicate with Londoño by the "live.com" email was not credible and itself showed bad faith. But the jury heard Burrola's and Londoño's competing testimony about the use or non-use of the "live.com" email account. And it sided with Burrola. Credibility determinations fall within the province of the jury, and we won't disturb those findings because Burrola's testimony was not "unbelievable on its face." *See United States v. Rivera*, 775 F.2d 1559, 1561 (11th Cir. 1985) ("For testimony of a government witness to be incredible as a matter of law, it must be 'unbelievable on its face.'") (citation omitted).

For these reasons, Londoño's due-process claim fails because he cannot establish that the Government acted in bad faith when it destroyed the evidence.

B.    <u>The district court did not abuse its discretion in issuing the challenged evidentiary rulings.</u>

Next, Londoño asserts that the district court erroneously excluded relevant and admissible evidence that would have supported his public-authority and innocent-intent defenses and wrongly prohibited the impeachment of key Government witnesses. He asks us to review four categories of evidence: (1) emails between law-enforcement agents and other Government personnel about Londoño's status and activities as a source of information or confidential informant; (2) emails between Londoño's attorneys and Roberto Luna, a confidential informant for the IRS; (3) official records from Argentina that he claims confirm his residency and asylum in that country between 2007 and 2009; and (4) limitations that the district court placed on his cross-examination of Santiago Aquino,[6] a special agent for the IRS. Londoño complains that the district court's refusal to admit these categories of evidence stripped him of his right to present a complete defense. And he contends the restriction on cross-examination unfairly prejudiced his defense and violated his right of confrontation. To correct these errors, Londoño requests a new trial.

---

[6] Londoño identifies Agent Aquino as "Sergio Aquino." His correct name is Santiago Aquino.

18-12888                Opinion of the Court                25

Generally, we review for abuse of discretion a district court's decision to exclude evidence. *United States v. Pon*, 963 F.3d 1207, 1219, 1221 (11th Cir. 2020); *United States v. Harris*, 886 F.3d 1120, 1127 (11th Cir. 2018). Under this standard, courts enjoy a "significant" range of permissible choice, *Pon*, 963 F.3d at 1219, as long as that choice "does not constitute a clear error of judgment." *United States v. Akwuba*, 7 F.4th 1299, 1313 (11th Cir. 2021) (citation omitted).

This discretion usually extends to a court's determination about whether evidence is relevant. Still, though, the district court doesn't have the discretion to exclude "crucial relevant evidence necessary to establish a valid defense." *United States v. Anderson*, 872 F.2d 1508, 1515 (11th Cir. 1989) (citation omitted)). Rather, evidence supporting a valid defense is admissible so long as the evidence has "substantial probative value" and "will not tend to prejudice or confuse" the jury. *United States v. Holt*, 342 F.2d 163, 166 (5th Cir. 1965).[7]

We also review the district court's decision to limit cross-examination of a government agent's lay testimony for abuse of discretion. *United States v. Jeri*, 869 F.3d 1247, 1262, 1265 (11th Cir. 2017). This discretion is subject to the requirements of the Sixth Amendment, which guarantees every accused the right to confront

---

[7] The decisions of the former Fifth Circuit issued before October 1, 1981, are binding in this Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

witnesses against him. *Id.* at 1262 (citing *United States v. Lankford*, 955 F.2d 1545, 1548 (11th Cir. 1992)).

Even so, though, the Confrontation Clause "guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Kentucky v. Stincer*, 482 U.S. 730, 739 (1987) (citation omitted). The defendant's rights under the Confrontation Clause are protected when the "cross-examination permitted exposes the jury to facts sufficient to evaluate the credibility of the witnesses and enables defense counsel to establish a record from which he can properly argue why the witness is less than reliable." *Mills v. Singletary*, 161 F.3d 1273, 1288 (11th Cir. 1998) (per curiam) (citation omitted). Once there is sufficient cross-examination to satisfy the Confrontation Clause, the district court may limit further cross-examination within its discretion. *Id.* (citing *United States v. Diaz*, 26 F.3d 1533, 1539 (11th Cir. 1994)).

Although we review the exclusion of evidence and limitation of cross-examination for an abuse of discretion, any error is ultimately subject to harmless-error review. Under that review, we will not reverse if the error was harmless beyond a reasonable doubt. *United States v. Edwards*, 211 F.3d 1355, 1359 (11th Cir. 2000). We ask "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Jeri*, 869 F.3d at 1262 (citation and internal quotation marks omitted). In turn, we assess whether an error is harmless by

considering things like "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and . . . the overall strength of the prosecution's case." *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

We address each category of evidence separately.

### 1. Government Emails

During trial, Londoño offered for admission into evidence emails that ICE agents Monks and Burrola authored or received, and emails between DEA agent Jorge Rodriguez and DEA analyst Chadd Calkins. The Government produced these emails during discovery, and Londoño sought to introduce them at trial during his cross-examination of Monks and his direct examination of Burrola. In opposing their admission, the Government argued that the emails were inadmissible hearsay. We briefly review the relevant sequence of events.

During his cross-examination of Agent Monks, outside the presence of the jury, Londoño sought to introduce emails as substantive evidence. The district court denied the request to use the emails as substantive evidence during the Government's case-in-chief. But the court said it would permit the evidence for other purposes, such as impeachment and refreshing witnesses' recollections.

Defense counsel objected, asserting that the emails were admissible as "party opponent admissions." But the district court disagreed. It said many of the emails could not be considered party-opponent admissions and noted that the emails in question were among a string of emails that contained extraneous communications. So the trial court explained that it needed "to evaluate each" email individually, an explanation it repeated the next day when Londoño continued his cross-examination of Monks. Defense counsel said he "accept[ed] the ruling."

Later, defense counsel questioned Monks about an email from Agent Chris Goumenis and moved to admit the email. The court admitted the document in redacted form.

Then, during direct examination of Agent Burrola, Londoño tried several times to admit an entire folder of emails as substantive evidence. The district court again explained that Londoño needed to show that each email was admissible.

When defense counsel began asking about a specific email, the district court determined that it contained extraneous information. So the court ruled that the email could be used for impeachment purposes only. Ultimately, the district court again admitted a single redacted email into evidence, including only what Burrola had written to another agent and not "the whole string of what everybody else had to say about it" in the email.

Still later, but during his examination of Burrola, Londoño sought to introduce a "packet of emails" as substantive evidence. The packet was purportedly the same as the folder of emails

18-12888                Opinion of the Court                29

counsel had previously sought to admit. Again, the district court explained that it wouldn't blanketly admit all emails because the emails contained extraneous material and Londoño needed to show admissibility. Defense counsel then offered to redact the extraneous information. The district court agreed and directed Londoño to review the emails, determine what information was relevant, provide redactions, and then confer with the Government. As the court explained, if the Government objected to the emails as redacted, the court would review individual emails that the defense wished to introduce.

But Londoño never acted on this directive and never again sought to move the emails into evidence. Instead, one week later, after Londoño rested his case and just minutes before closing arguments were to begin, defense counsel raised the issue of the "Burrola emails." The court reminded defense counsel of its earlier instruction to redact the documents and confer with the Government before submitting the emails. Defense counsel responded he had done so and was submitting the emails. But the Government replied that it had not agreed that all the irrelevant information had been redacted. So the court said, "That ends the inquiry." Then the court denied the request to move the folder of emails into evidence.

In his motion for new trial, Londoño argued the emails should have been admitted under Rule 801(d)(2),[8] Fed. R. Evid., as

---

[8] Rule 801(d)(2), Fed. R. Evid. categorizes an opposing party's statement as non-hearsay under certain circumstances.

party-opponent admissions. The district court denied the motion. It emphasized that Londoño had waited "until after resting his case and minutes before closing arguments" to seek to admit the redacted emails. And even then, the court continued, Londoño had failed "to establish the relevancy of each email, to redact the irrelevant information as directed by the Court, and to formally move the redacted relevant emails of government agents into evidence during his case in chief."

On appeal, Londoño asserts that the district court should have admitted the Government emails into evidence. In Londoño's view, each email was relevant "on its face" because each contained information about the nature and extent of the Government's authorization and use of Londoño as a cooperator, and the emails contained partial summaries of information Londoño provided. Londoño conclusorily asserts that the emails were admissible under Rule 801(d)(2) as admissions by a party opponent, under Rule 803(3) as statements of a declarant's then-existing state of mind, under Rule 803(6) as business records, under Rule 803(7) as public records, and under Rule 807's residual clause. But Londoño fails to develop these arguments in any way.

Instead, Londoño contends the district court made two errors. First, Londoño claims he objected to the district court's requirement that he redact extraneous matters from the emails he sought to introduce. Second, he argues the district court never reviewed the redacted emails and instead erroneously accepted the Government's position that the emails should not be admitted.

Londoño's bare argument is inadequate. To begin, our review of the record reveals that defense counsel did *not* object to the district court's requirement that he redact the emails he wanted to introduce into evidence. To the contrary, defense counsel offered to redact at one point. And in any case, we would not conclude that the district court abused its discretion in requiring counsel to redact extraneous information from evidence he sought to admit.

As for Londoño's assertion that the district court never reviewed the emails, Londoño never presented the emails to the court to review during his presentation of his case. And even assuming Londoño had complied with the court's directive to redact the emails of extraneous information and had timely offered them, we have no way on appeal of determining whether the district court erred because Londoño didn't proffer or otherwise identify the particular redacted emails he sought to introduce. Beyond that, in any case, Londoño offers no real argument other than bare citations to various rules of evidence.

So we reject Londoño's argument that the district court should have permitted him to introduce a folder of emails between law enforcement and other Government personnel that apparently contained irrelevant and extraneous information.

### 2.    *Roberto Luna Emails*

During the defense case, Londoño called confidential informant Roberto Luna. Luna acknowledged and authenticated emails he exchanged with Londoño's Colombian attorney, Luis Lopera, between November 15, 2008, and April 30, 2009. These

emails addressed Londoño's potential cooperation with the IRS.

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████

Londoño sought to enter these emails into evidence as admissions of a party opponent under Federal Rule of Evidence 801(d)(2). The Government objected on hearsay grounds. And the district court declined to admit the emails. The court concluded that even if Rule 801(d)(2) generally applied, Luna could not be considered an agent of the Government because, before trial, Lopera had questioned Luna's credibility and whether he worked for the Government. Londoño argues the district court's decision to exclude the Luna-Lopera emails compromised his ability to present his defense and allowed the Government to argue that the IRS never authorized Londoño to infiltrate the Urabeños.

Londoño acknowledges that we haven't yet squarely decided whether a government informant can be a party opponent of the defendant in criminal cases. But he contends that the Federal Rules of Evidence contemplate that one can. Londoño further asserts the district court applied the wrong test in resolving Luna's reliability. He says the question is not whether a defense witness (Lopera) questioned Luna's credibility, but rather whether the Government found Luna to be credible. And here, the Government found Luna to be credible. Indeed, Londoño points out, the Government used Luna as a confidential informant over the years.

The issue of whether the district court abused its discretion boils down to whether statements made by government informants count as the Government's admission. Rule 801(d)(2), Fed. R. Evid., makes a party opponent's out-of-court statement offered for the truth of the matter not hearsay when offered against the opposing party. To satisfy this rule, the proponent of the evidence must offer the evidence against the opposing party and must establish one of five things: (A) the statement was made by the party "in an individual or representative capacity;" (B) the statement is one the party "adopted or believed to be true;" (C) the statement was made by "a person whom the party authorized to make a statement on the subject;" (D) the statement was made by the party's agent or employee regarding a "matter within the scope of that relationship[;]" or (E) the statement was made by the party's "coconspirator during and in furtherance of the conspiracy." Rule 801(d)(2), Fed. R. Evid.; *see also United States v. Holland*, 117 F.4th 1352, 1356 (11th Cir. 2024). Londoño suggests that the Luna emails were admissible under Rule 801(d)(2)(B) or (D), Fed. R. Evid.

Londoño has not established that the district court abused its discretion when it excluded the Luna emails. Under an abuse-of-discretion review, we will not reverse a district court's decision to exclude evidence unless the ruling is "manifestly erroneous." *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004). This means we will affirm "unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." *United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018) (citation omitted).

As an initial matter, both parties recognize that this Court has not weighed in on whether statements by a government informant are considered statements of a party opponent for purposes of Rule 801(d)(2), Fed. R. Evid.[9] In fact, our survey of relevant caselaw reveals that only one of our sister courts has said they do. *United States v. Branham*, 97 F.3d 835 (6th Cir. 1996). In *Branham*, the Sixth Circuit found that a paid government informant's conversations with a criminal defendant were admissible under Rule 801(d)(2)(D) as an agent of the government where the informant spoke with the defendant on a "regular basis in order to establish a trusting relationship." *Id.* at 851.

On the other hand, at least two of our sister courts—the Second and the Seventh Circuits—have come to the opposite conclusion.

The Second Circuit has held that a government informant's statements are not admissible under Federal Rule of Evidence 801(d)(2) as admissions of a party opponent in a criminal prosecution if offered for the truth of the statements. *United States v. Yildiz*, 355 F.3d 80, 82 (2d Cir. 2004). In *Yildiz*, the Second Circuit relied on its earlier decision in *United States v. Santos*, 372 F.2d 177 (2d Cir. 1967). There, the Second Circuit concluded, before the adoption of the Federal Rules of Evidence, that "the inconsistent out-of-

---

[9] Our predecessor Court likewise did not decide whether informants are agents of the Government for purposes of Rule 801(d)(2). *See United States v. Pena*, 527 F.2d 1356, 1361 (5th Cir. 1976).

court statements of a government agent made in the course of the exercise of his authority and within the scope of that authority . . . [were] not . . . admissible . . . 'evidence of [a] fact.'" *Santos*, 372 F.2d at 180. And the *Yildiz* court pointed out that "[m]ost courts continue to follow *Santos*" even after the adoption of the Federal Rules. *Yildiz*, 355 F.3d at 81 (citing *United States v. Prevatte*, 16 F.3d 767, 779 n. 9 (7th Cir. 1994); *United States v. Kampiles*, 609 F.2d 1233, 1246 (7th Cir. 1979); and a few district court decisions).

Next, in *United States v. Arroyo*, the Seventh Circuit concluded that the district court did not abuse its discretion in excluding a memo an IRS agent prepared about an interview with a confidential informant. 406 F.3d 881, 887 (7th Cir. 2005). In so holding, the court pointed out that it had previously found that "government agents are not party-opponents for purposes of Rule 801(d)(2)." *Id.* at 888 (citing *Prevatte*, 16 F.3d at 779 n. 9 (quoting *Kampiles*, 609 F.2d at 1246)).

Other circuits have also come close to agreeing with the Second and Seventh Circuits. In *Lippay v. Christos*, 996 F.2d 1490, 1499 (3d Cir. 1993), the Third Circuit opined that, as a general matter, Rule 801(d)(2)(D) does not cover informants' statements. But the court did not adopt a *per se* rule that an informant could never serve as an agent under the rule. *Id.* Instead, the court said it would look at each case individually to determine "whether the officer had a sufficiently continuous supervisory relationship with the inform[ant] to establish agency." *Id.* In *Lippay*, though, the court excluded the informant's statement because the informant "lacked

the status of an employee regularly controlled" by the law enforcement officer. *Id.*

For its part, the D.C. Circuit, in *United States v. Morgan*, 581 F.2d 933, 938 (D.C. Cir. 1978), opined generally that statements the government has "manifested its 'adoption or belief '" in are more likely to fall under Rule 801(d)(2), Fed. R. Evid. Still, the court was careful not to decide that all informants' statements were admissible against the government. *Id.* Rather, it held only that when "the government has indicated in a *sworn affidavit* to a judicial officer that it believes particular statements are trustworthy," it may not object to the introduction of those statements. *Id.* (emphasis added).

Finally, in *United States v. Garza*, 448 F.3d 294, 298 (5th Cir. 2006), the Fifth Circuit found no abuse of discretion when the district court excluded a Department of Justice investigator's report as hearsay. It rejected arguments that the report was admissible under Rule 801(d)(2), and it acknowledged that other circuits had declined to apply Rule 801(d)(2)(D) to government agents' statements, particularly in criminal trials. *Id.*

Given the unsettled status of the law on this issue, we can't say that the district court's decision to exclude the Luna emails was "manifestly erroneous." No Eleventh Circuit case exists that permits the admission of an informant's statement against the Government under Rule 801(d)(2). Nor did our predecessor Court decide whether informants are agents of the government for purposes of Rule 801(d)(2). *See Pena*, 527 F.2d at 1361. And as we've

noted, a few of our sister courts have determined that government informants' statements do not fall under Rule 801(d)(2) at all. Not only that, but the courts that have allowed admission of these types of statements have done so under particularized circumstances. So we can't conclude that the district court abused its discretion in excluding the Luna emails under the circumstances.

### 3.    *Argentine Records*

Next, Londoño takes issue with the district court's exclusion of Argentine records. Londoño says that these records confirm his residency in Argentina, include his request for and grant of asylum in the country from 2007 through the early part of 2009, and explain why Londoño had false identity cards. Londoño asserts that the records are relevant under *United States v. Hurn*, 368 F.3d 1369 (11th Cir. 2004). And he contends they help establish his alibi defense and corroborate his explanation about why he relocated to Argentina and why he returned to Colombia.

To address this claim, we must first review the relevant procedural history. Before trial, during a status conference, Londoño sought to introduce about 4,100 pages of documents, mostly in Spanish. He argued that these documents showed he left Colombia because of alleged political persecution and explained his presence in Argentina. The district court ruled that Londoño could testify that he was living legitimately in Argentina. But it denied Londoño's request to introduce documents relating to political persecution. The court explained its ruling by noting it wouldn't allow

Londoño to challenge the indictment on the ground that he was politically persecuted.

In his motion for a new trial, Londoño based his argument, in part, on the fact that the district court excluded the Argentine records. He asserted that the documents would have showed he lived in Argentina in late 2007 and early 2008 and would have rebutted the testimony of a government witness who claimed Londoño lived in Colombia at that time. Londoño also argued that the records would have corroborated his testimony that he was a victim of political persecution in Colombia. Plus, Londoño contended, the records would have established his motivation for leaving Colombia and suggested the impossibility that he could have been drug trafficking in Colombia during the timeframe the Government suggested. The district court concluded that Londoño had not shown that the court's rulings were erroneous and denied the motion.

On appeal, Londoño argues that the records from Argentina would have established six things: (1) that he arrived in Argentina in 2007; (2) that he reported his presence to Argentine authorities upon arrival; (3) that he applied for residency in Argentina and was domiciled in Buenos Aires under his true name in 2007 and 2008; (4) that he was under the strict supervision of Argentine immigration authorities during that period; (5) that he had to report to the authorities several times each month as a condition of his supervision; and (6) that Argentina granted him asylum as a political refugee in April 2008. This evidence, Londoño says, was critical to his

defense because it would have refuted the testimony of five of the Government's witnesses. These witnesses testified that Londoño had rejoined the Urabeños as early as 2007—two years earlier than Londoño's own testimony that he joined in 2009. Londoño urges that the Argentine documents also explain why he had five false identity cards and a false passport—namely, that Londoño's political-refugee status authorized him to have these documents.

The district court did not abuse its discretion in excluding thousands of pages of Argentine records during trial. First, Londoño raised different arguments in the district court in his motion for new trial than he did at trial with respect to the documents. At trial, he argued the documents would have corroborated that he was a victim of political persecution in Colombia. But that's not relevant to Londoño's innocence or guilt on the indicted charge.

Evidence is relevant "if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Nullification of an indictment is not a defense that a defendant may present at trial, so evidence relevant to only that issue is not otherwise relevant to the case. *See United States v. Funches*, 135 F.3d 1405, 1408 (11th Cir. 1997). Put another way, "the potential for nullification is no basis for admitting otherwise irrelevant evidence." *Id.* at 1409. Here, to the extent Londoño sought to introduce the Argentine documents to argue that his indictment was politically motivated, the district court did not err in finding them to be irrelevant.

Alternatively, even interpreting the record generously and accepting Londoño's post-trial arguments—that he sought admission of this evidence to prove his presence in Argentina in 2007 and 2008 and to show that he was authorized to have false travel documents—his claim still fails. The district court did not abuse its discretion in excluding this evidence because it is cumulative.

Londoño presented other evidence on the same points. Plus, the documents Londoño sought to admit consisted of thousands of pages in a foreign language. Under these circumstances, the district court acted within its discretion in excluding the evidence under Rule 403. *See United States v. Al-Arian*, 514 F.3d 1184, 1189 (11th Cir. 2008).

For starters, Londoño testified at trial that he was in Argentina in 2007 and 2008 and that he was authorized to have false travel documents. He testified that he left Colombia in June 2007 because he was in danger due to complaints he made against high-ranking officers in the police. And he testified that when he arrived in Argentina with his family in July 2007, he sought political asylum, and Argentina granted him permanent residency. Londoño also denied traveling to Colombia in 2007. Then he testified that he went back to Colombia in February 2009 to "infiltrate" criminal groups on behalf of the Government.

Similarly, the district court did not preclude Londoño from testifying about the false documents. During cross-examination, the Government introduced an Uruguayan passport issued to Londoño under a different name. Londoño claimed he had never

used it. He admitted to having fake Venezuelan documents and using them to travel to Argentina in 2011.

And most importantly, if Londoño had been able to introduce the Argentine documents, they would have shown only that he was a legal resident of Argentina during a given timeframe. But of course, that fact would not have precluded him from traveling to Colombia and committing criminal acts as charged.

For these reasons, the district court did not abuse its discretion in excluding the official records from Argentina.

### 4.　Cross-Examination of IRS Agent Santiago Aquino

Londoño asserts the district court violated his Fifth and Sixth Amendment rights by improperly restricting his counsel's cross-examination of IRS Agent Santiago Aquino. In Londoño's view, Agent Aquino essentially testified that the IRS never officially signed Londoño as a confidential informant nor requested that he perform any specific tasks.

But Londoño says documents the Government produced in discovery—including a report Roberto Luna submitted to the IRS, and emails between Luna and Londoño's counsel, Luis Lopera, along with emails between Luna and Carlos Mario Garcia—contradict Aquino's testimony. Londoño asserts these documents suggest that ████████████████████████████████ ████████████████████████████████.

When defense counsel tried to ask Agent Aquino about these emails, the Government objected that they were hearsay.

The district court sustained the objection. ███████████



███████████ Londoño also asserts that the district court's ruling prevented him from being able to establish that ███████████

███████████

        The district court did not abuse its discretion in disallowing questions about the non-admitted evidence as inadmissible hearsay. Here, defense counsel sought to use Agent Aquino's cross-examination as a backdoor way of admitting the contents of the emails. But the contents were hearsay. And the declarants in the emails and report—Luna, Lopera, and Garcia—were all available. So Londoño could have questioned them about ███████████ directly. *See* Rule 801(d)(1), Fed. R. Evid. (statements are not hearsay where the declarant testifies and is subject to cross-examination about a prior statement). For whatever reason, he chose not to do so. The district court's decision to limit the cross-examination of Aquino on these topics to avoid the admission of hearsay was not an abuse of its discretion.

        The district court also had wide discretion to limit the cross-examination of Aquino, in any case, as long as it allowed for sufficient inquiry into his credibility. And that it did. The district court

restricted only questions that called for answers that were hearsay. It didn't restrict cross-examination ███████████████ ██████████████. The court also allowed defense counsel to cross-examine Agent Aquino on the dangers of infiltrating a criminal organization. Aquino said in response that Londoño was never instructed to infiltrate such an organization.

In short, the district court did not abuse its discretion when it limited that cross-examination of Agent Aquino.

C.    <u>The district court did not err in its communications with the jury.</u>

Londoño next challenges the district judge's communications with the jury in two respects. First, Londoño contends that the district court erred because it did not give the jury an adverse-inference instruction about the Government's "knowing and intentional destruction of" the cell phones ICE agents used to communicate with him. And second, Londoño argues that the district court abused its discretion when it responded to a jury question about the number of witnesses that the jury needed to find credible to reach a verdict.

### 1.    *Request for Adverse-inference Instruction*

First, Londoño challenges the district court's refusal to give the jury an adverse-inference instruction based on the Government's destruction of the BlackBerry phones. In support, he asserts

44                    Opinion of the Court                    18-12888

that the evidence supported his requested instruction[10] and the proposed instruction correctly stated the law. He also contends that the rest of the instructions did not otherwise cover the same ground, and the proposed instruction dealt with a "vital

---

[10] Londoño filed proposed jury instructions, including the following adverse-inference instruction:

> During the course of this trial you have heard evidence that during the course of Defendant's cooperation on behalf of federal law enforcement in Colombia from November 2009 to February 2011, Defendant communicated via text [and email] with ICE Agents Frank Burrola and Steven Monks in which he was tasked with several intelligence[] gathering missions and through which means he also reported the results of these tasks. The law enforcement agents and by extension the Government, was obligated to preserve all of these text messages, but the agents and their ICE supervisors purposely failed to do so.
>
> Because these BlackBerry messages and emails constituted exculpatory evidence probative of his public authority defense you may infer from the Government's destruction of this evidence that the substance of ICE Agents Burrola and Monk's communications with the Defendant would have supported his position that he was authorized to engage in certain criminal activity necessary to effectuate his intelligence gathering tasks that included conspiring with known drug traffickers as described in the Government emails presented as evidence in this case.
>
> You are not required to make this inference, however, and you must consider any rebuttal evidence that has been offered by the Government with regard to this issue. Whether you ultimately choose to make the inference is your decision as the finder of fact.

component" of his defense. Londoño argues that the court's failure to give the requested instruction "seriously impaired" his ability to defend himself.

Londoño concedes that we have not yet squarely decided whether an adverse-inference instruction based on the Government's spoliation of evidence is appropriate in a criminal case. But he notes we have done so in civil cases. Londoño also emphasizes that some of our sister circuits have recognized a criminal defendant's entitlement to an adverse-inference instruction in criminal cases under certain circumstances. And he urges us to join these circuits and announce that an adverse-inference jury instruction is appropriate in a criminal case when the Government knowingly destroyed exculpatory evidence.

Generally, we review the district court's refusal to provide a requested jury instruction for abuse of discretion. *United States v. Melgen*, 967 F.3d 1250, 1259 (11th Cir. 2020). Under that standard, we will reverse only if "(1) the instruction is substantially correct, (2) the instruction was not addressed in the charge actually given, and (3) the failure to give the requested instruction seriously impaired the defendant's ability to present an effective defense." *United States v. Horner*, 853 F.3d 1201, 1208 (11th Cir. 2017), *cert. denied*, 138 S. Ct. 674 (2018) (quoting *United States v. Drury*, 396 F.3d 1303, 1318 (11th Cir. 2005) (internal quotation marks omitted). If the jury instruction that the court gave accurately reflects the law, the district court has wide discretion to decide on the wording of the instruction. *Id*. We examine jury charges as a whole to decide

whether the entire jury charge adequately instructed the jury about the issues in the case. *Id.* The requested instruction must have "legal support" and "some basis in the evidence." *United States v. Zlatogur*, 271 F.3d 1025, 1030 (11th Cir. 2001); *United States v. Morris*, 20 F.3d 1111, 1114–15 (11th Cir. 1994).

Here, though, Londoño didn't preserve his request for an adverse-inference instruction on the BlackBerry-destruction issue.[11] *See United States v. Gutierrez*, 745 F.3d 463, 471 (11th Cir. 2014) (citing Fed. R. Crim. P. 30(d) (appellant failed to object to instruction before jury retired) and *Zlatogur*, 271 F.3d at 1030. To be sure, Londoño initially requested an adverse-inference instruction. But he never objected to any of the instructions the court delivered to the jury.

So we review the failure to give an adverse-inference instruction for plain error. *United States v. Fey*, 89 F.4th 903, 913 (11th Cir.

---

[11] Londoño initially requested the instruction in his proposed jury instructions. He also asked for an adverse-inference instruction in his objections to the magistrate judge's report and recommendation on the motion to dismiss the indictment and in his Rule 29 argument seeking for the district court to reconsider the denial of the motion to dismiss. But Londoño failed to preserve the argument because he didn't request that the court give the adverse-inference instruction when (1) the district court distributed draft jury instructions at the charge conference; (2) the district court alerted the parties to changes to the jury instructions and asked if any issues remained at the conclusion of the Government's case in rebuttal; or (3) the district court distributed and read aloud the jury instructions, charged the jury, and then asked counsel if any issues remained after both parties completed their closing arguments.

2023) (finding because defendants did not object to the jury instructions before the case went to the jury, the plain error standard applies). To prevail under this standard, Londoño must show that the district court made an error, that the error was plain, and that the error affected his substantial rights. *Id.* (citing *United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005)). This standard is demanding. We must consider the totality of the charge to the jury as a whole, view the charge in light of the entire trial, and determine whether "the error was probably responsible for an incorrect verdict." *United States v. Iriele*, 977 F.3d 1155, 1179 (11th Cir. 2020) (citation and internal quotation marks omitted).

When we apply the plain-error standard here, we must reject Londoño's claim. As we've noted, Londoño has conceded that we have not yet determined in the criminal context that district courts may give adverse-inference jury instructions for the Government's destruction of evidence. That dooms his claim. As we've explained, if the language of a statute or rule does not resolve an issue, plain error exists only when this Court's or the Supreme Court's precedent directly resolves the issue. *United States v. Moore*, 22 F.4th 1258, 1266 (11th Cir. 2022).

But the only case Londoño relies on from this Circuit— *United States v. Lanzon*—assumed without deciding that an adverse instruction was available in the criminal context and determined that, in that scenario, the defendant must show bad faith in the lack of preservation of evidence. 639 F.3d 1293, 1302-03 (11th Cir. 2011). All other cases Londoño relies upon come from other

circuits. S*ee United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016); *United States v. Romo-Chavez*, 681 F.3d 955, 961 (9th Cir. 2012); *United States v. Laurent*, 607 F.3d 895, 902-03 (1st Cir. 2010); *United States v. Boxley*, 373 F.3d 759, 762-63 (6th Cir. 2004); and *United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2010). These out-of-circuit cases, of course, are not binding on us.

In short, no binding precedent from this Circuit or the Supreme Court holds that district courts must or even may give adverse-inference jury instructions for the Government's destruction of evidence. So we cannot find plain error in the district court's rejection of Londoño's proposed jury instruction. *See United States v. Frank*, 599 F.3d 1221, 1239 (11th Cir. 2010) (explaining that a district court's error is plain only if binding precedent from this Court or the Supreme Court resolves that error).

### 2.    *The District Court's Response to a Jury Question*

Second, Londoño argues that the district court "abdicated [its] responsibility" when it responded to a jury question about the number of witnesses the jury needed to find credible to reach a verdict. He contends that this error amplified the Government's alleged misstatement of the law during its closing arguments that the jury needed to believe only one witness to convict. We reject this argument.

During its initial summation, the Government told the jury, "I submit to you that if you believe any one witness, any witness who testified that they knew the defendant during the time of the conspiracy, that alone proves the defendant's guilt beyond a

reasonable doubt. That satisfies all of the elements." Later, in its rebuttal argument the Government argued, "Now, again with respect to the 15 cooperating witnesses that the Government put in its case, you only have to believe one." Londoño contends these statements were incorrect in the context of this case.

According to Londoño, some of the Government's cooperating witnesses testified about only activities that had "no jurisdictional nexus to the United States" and therefore could not have formed the basis of the charged conspiracy to violate 21 U.S.C. § 959(a). Londoño emphasizes that the language of the statute requires a nexus to the United States as an element of the offense.

Besides that, Londoño says one of the witnesses, Juan Guillermo Valenzuela Jaramillo, was cooperating with the Government when he was supposedly conspiring with Londoño. So if the jury believed only this witness, Londoño suggests that a key element of the charged conspiracy may not have been proven since a person cannot conspire with an informant or government agent.

With these arguments in mind, Londoño takes issue with a question the jury asked on the second day of deliberations. Specifically, the jury sent a note to the trial judge asking, "Just to confirm, the judge stated the threshold requirement may be that [we] only need to believe one witness in order to arrive [at] a decision[.]" In response to the question, counsel and the judge discussed the note. Defense counsel pointed out that it was the prosecutor who made the statement, not the court; said the statement regarding a "threshold requirement" was not the law; and asked the trial judge

50                         Opinion of the Court                    18-12888

to clarify the statement and tell the jury that it must "consider all the evidence."

The trial judge responded to the request, stating that he would not answer the question posed by the jury directly and instead would direct the jury to the credibility-of-witness instruction previously delivered as part of the jury charge. In turn, the judge told the jury, "Ladies and gentlemen of the jury, please reread the credibility of witness instruction on page 5."[12]

Based on this series of events, Londoño suggests that the jury's question remained unanswered. As a result, he says, the jury was left free to convict without the Government's satisfaction of its burden to prove each element of the offense beyond a reasonable doubt and without considering the defenses of public authority and innocent intent.

We review for abuse of discretion the district court's response to a question from the jury. *United States v. Joyner*, 882 F.3d 1369, 1375 (11th Cir. 2018) (citing *United States v. Lopez*, 590 F.3d 1238, 1247 (11th Cir. 2009)). To find an abuse of discretion, we must have a "substantial and ineradicable doubt as to whether the

---

[12] That jury instruction explained, in relevant part, "When I say you must consider all the evidence, I don't mean that you must accept all the evidence as true or accurate. You should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness in whole or in part. The number of witnesses testifying concerning a particular point does not necessarily matter."

jury was properly guided in its deliberations." *Id.* (citation omitted). Even where we find that a district court abused its discretion, we will not reverse if the error was harmless. *United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018). An error is not harmless if it caused substantial prejudice to the affected party. *Id.*

The district court did not abuse its discretion when it responded to the jury question. First, the district judge's response to the jury question addressed defense counsel's concern that the jury should be clear that it was required to consider all evidence. When the district court redirected the jury to the witness-credibility instruction, it reiterated that the jury should "consider all the evidence" and the jury did not have to accept all of the evidence as true.

Second, the district court's response to the jury question was not an abuse of discretion because it was a correct statement of the law and did not confuse the jury. *Joyner*, 882 F.3d at 1375. Indeed, the jury did not ask any further clarifying questions. *See United States v. Baston*, 818 F.3d 651, 662 (11th Cir. 2016). Third, another charge directed the jury that "anything the lawyers say is not evidence and isn't binding on you" and that the jury must "follow the law" and "follow all of [its] instructions as a whole." So the jurors knew that they could not take counsel's statements as evidence and they had to follow the law. We presume jurors obey the court's instructions. *See United States v. Buselli*, 106 F.4th 1273, 1289 (11th Cir. 2024) (citing *United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993)).

Not only that, but when we consider the entirety of the jury instructions, we conclude that they neatly set out the elements of the charged crime for the jury to follow. And the defense did not dispute the accuracy of the substantive jury instructions. The trial judge's response to the jury note also reflected the bedrock principle that the jury is "free in the exercise of their honest judgment[] to prefer the testimony of a single witness to that of many." *Weiler v. United States*, 323 U.S. 606, 608 (1945). That's so because "[t]he touchstone" "[i]n gauging the truth of conflicting evidence" "is always credibility." *Id.* For this reason, we have long held that "[t]he uncorroborated testimony of an accomplice is sufficient to support a conviction if it is not on its face incredible or otherwise insubstantial." *United States v. Butler*, 792 F.2d 1528, 1536 (11th Cir. 1986) (citing *United States v. Iacovetti*, 466 F.2d 1147, 1153 (5th Cir. 1972)).

Because the district court correctly stated the law and did not confuse the jury, it did not abuse its discretion in its response to the jury question. We simply are not left with a "substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Joyner*, 882 F.3d at 1375 (citation omitted). We find no abuse of discretion.

D.    The Government's prosecution of Londoño did not violate the rule of specialty.

Londoño also seeks to set aside his conviction on the ground that the Government violated the rule of specialty. More specifically, he asserts that the Government presented factual allegations and cooperating witnesses to Argentina in support of its

extradition request that differed from its factual allegations and tes-
tifying witnesses at trial.  We conclude the Government's prosecu-
tion of Londoño did not violate the rule of specialty.

The rule of specialty, sometimes referred to as the doctrine
of specialty, is a general rule that binds the Government to prose-
cute a person who has been extradited for only those offenses for
which he has been extradited. *Gallo-Chamorro v. United States*, 233
F.3d 1298, 1305 (11th Cir. 2000) ("*Gallo-Chamarro II*") (citations and
internal quotation marks omitted); *United States v. Puentes*, 50 F.3d
1567, 1572 (11th Cir. 1995) (citing *United States v. Herbage*, 850 F.2d
1463, 1465 (11th Cir. 1988); M. Bassiouni, *International Extradition:
United States Law and Practice*, vol. 1, ch. 7, sec. 7, pp. 359-60 (2d rev.
ed. 1987)).

The rule of specialty dates to the nineteenth century. *See
United States v. Rauscher*, 119 U.S. 407, 420-21 (1886) (articulating,
for the first time, the rule of specialty).  It derives from principles
of international comity requiring states to honor limitations on
prosecutions of citizens of other states. *See id.* (citing *United States
v. Najohn*, 785 F.2d 1420, 1422 (9th Cir. 1986)).  Individuals who have
been extradited under an extradition treaty may invoke provisions
of that treaty to challenge the court's exercise of personal jurisdic-
tion. *See Puentes*, 50 F.3d at 1573-74.

Here, Londoño was extradited under the extradition treaty
between the United States and Argentina ("Extradition Treaty"),
which incorporated the rule of specialty. *See* Extradition Treaty,
U.S.-Arg., art. 16, June 10, 1997, T.I.A.S. No. 12,866.  Article Sixteen

of the Extradition Treaty mandates that the parties may not detain, try, or punish a person extradited under the treaty in the requesting state "except for: (a) the offense for which extradition was granted or a differently denominated or less serious offense based on the same facts on which extradition was granted, provided such offense is extraditable; (b) an offense committed by that person after his or her surrender; or (c) an offense for which the competent authority of the Requested State consents to the person's detention, trial, or punishment." *Id.*

In support of its request for extradition, the Government submitted to Argentina the affidavit of DEA Agent Chris Goumenis and Diplomatic Note 395. These documents set forth a summary of the evidence against Londoño. They alleged he was involved in a conspiracy to traffic cocaine to the United States. The documents also sought Londoño's extradition so he could face charges in the United States for a narcotics-conspiracy offense.

Argentina granted the Government's request. Its extradition order explained that Argentina granted Londoño's extradition "for Count One concerning the crime of combination for unlawful purposes or conspiracy to distribute a controlled substance (five kilos or more of cocaine), knowing said substance would be illegally imported into the United States of America." Argentina placed no other restrictions on its extradition order. The jury here convicted Londoño of this same charge.

But Londoño complains on appeal that the facts the supporting Goumenis affidavit contained differed from the facts the

18-12888                 Opinion of the Court                        55

Government presented at Londoño's trial. Londoño catalogues the following differences: (1) none of the cooperating witnesses referenced in the affidavit testified at trial; (2) the Government claimed in the affidavit that Londoño was the leader of the Urabeños but posited that he wasn't the leader at trial; (3) no witness testified about certain cocaine shipments the affidavit discussed; (4) the Government didn't introduce any recordings of the conversations it discussed in the affidavit; (5) no witness testified about meetings with other Colombian guerrilla groups; and (6) the informant who supplied the information in the affidavit didn't testify at trial.

Londoño asserts that the Extradition Treaty "requires that the extraditable offense is fact based and not tied to a specific statutory violation." That's because he defines "offense" as used in the rule of specialty as "fact specific," rather than "dependent upon . . . the statutory violation charged in an indictment." For support, Londoño cites *Gallo-Chamarro II*. There, we explained that the doctrine of specialty "requires . . . that the prosecution be based on the same facts as those set forth in the request for extradition." *Gallo-Chamorro II*, 233 F.3d at 1305 (quoting *United States v. Sensi*, 879 F.2d 888, 895-96 (D.C. Cir. 1989)).

In contrast, the Government argues that the term "offense" in the rule of specialty refers to the violation(s) with which it charged the extradited individual. It asserts that's so because the rule of specialty allows the requesting state to specify the crime(s) for which it will try the extradited individual.

We review *de novo* questions of treaty interpretation. *World Holdings, LLC v. Fed. Republic of Germany*, 701 F.3d 641, 649 (11th Cir. 2012). And, as relevant here, we review *de novo* claims that a district court violated the rule of specialty in the governing extradition treaty. *Puentes*, 50 F.3d at 1575.

We have never defined "offense" as the rule of specialty employs the term. But our precedent suggests that interpreting "offense" as strictly fact-based is incorrect. So we reject Londoño's suggestion that extradition materials control the universe of proof that the Government can present at trial. Below, we discuss our precedent that requires this conclusion.

We have interpreted the rule of specialty to permit the admission of evidence at trial related to offenses for which the requested country denied extradition. In *United States v. Bowe*, for instance, the defendant was extradited from the Bahamas on a single count of a thirteen-count indictment charging him with participation in several narcotics-related offenses, including a conspiracy count. *United States v. Bowe*, 221 F.3d 1183, 1187 (11th Cir. 2000). The district court dismissed the twelve counts for which the Bahamas had not granted extradition, and the defendant was later convicted on the remaining conspiracy count. *Id.* The defendant appealed his conviction, arguing that the government's introduction of evidence relating to the twelve dismissed charges violated the doctrine of specialty. *Id.* at 1191. He claimed that the government had, in effect, tried him on all counts because of the "sweeping nature of the evidence" allowed at trial. *Id.*

We rejected the argument. *Id.* As we explained, the doctrine of specialty "does not affect the scope of proof admissible at trial for the charges for which extradition was granted, . . . and . . . does not alter the forum country's evidentiary rules." *Id.* (citing *Puentes*, 50 F.3d at 1576; *United States v. Archbold–Newball*, 554 F.2d 665, 685 (5th Cir. 1977)). And we noted that we had previously allowed the government to introduce evidence of uncharged drug and money-laundering activity to obtain a conspiracy conviction with respect to extradited defendants. *Id.* (citing *United States v. Lehder-Rivas*, 955 F.2d 1510, 1520 (11th Cir. 1992)). At bottom, we concluded that, because the Bahamas approved extradition for the count on which the defendant was convicted—conspiracy to import cocaine—the government's broad use of evidence did not violate the doctrine of specialty. *Id.* at 1192.

And in *United States v. Puentes*, we rejected an interpretation of the doctrine of specialty that would have restricted the government's ability to use evidence beyond the scope of what it presented to the extraditing state. *See Puentes*, 50 F.3d 1567. There, Uruguay granted the defendant's extradition for four counts, including conspiracy to import cocaine from 1982 to 1988. *Id.* at 1569. The grand jury later returned a superseding indictment expanding the period of the conspiracy from 1982 to 1991 and adding other defendants. *Id.* at 1569-70. Puentes was convicted of conspiracy to import cocaine, in violation of 21 U.S.C. § 952(a).

On appeal, Puentes argued that we should reverse his conviction because prosecution under the revised conspiracy charge

violated the doctrine of specialty. *See id.* at 1576. More specifically, he contended that "a foreign court may limit the quantum of proof used to secure a conviction in an American court." *Id.* We disagreed, reasoning that the revised conspiracy charge did not materially alter the substance of the offense for which Uruguay had extradited Puentes. *Id.* Rather, it merely broadened the scope of evidence that the government could submit to prove the offense for which Uruguay had granted extradition. *Id.* (relying in part on *United States v. Alvarez-Moreno*, 874 F.2d 1402, 1414 (11th Cir. 1989), *cert. denied*, 494 U.S. 1032 (1990) (holding that "the doctrine of specialty does not purport to regulate the scope of proof admissible in the judicial forum of the requisitioning state")). We therefore affirmed the conviction and sentence. *Id.* at 1569.

*Bowe* and *Puentes* are not outliers, as the cases they cite evidence. Our Court and the other federal courts of appeals have consistently held that the government may introduce evidence other than the evidence presented to the extraditing country to prove its case at trial. *See Lehder-Rivas*, 955 F.2d at 1520 (allowing introduction of evidence of uncharged drug and money-laundering activity to obtain a conspiracy conviction of defendant who was extradited); *Alvarez-Moreno*, 874 F.2d at 1413-14 (determining that evidence of money laundering was admissible to prove drug conspiracy for which extradition was granted); *United States v. Flores*, 538 F.2d 939, 944 (2d Cir. 1976) (concluding that evidence of acts and statements of both the defendant and co-conspirators were admissible to prove conspiracy charge for which defendant was extradited, even though that evidence predated the period for the

conspiracy as outlined in the surrender decree); *Ficciono v. Attorney General*, 462 F.2d 475, 481 (2d Cir. 1972) (no violation of rule of specialty where defendant was extradited to stand trial on narcotics conspiracy from 1968–69 in the District of Massachusetts and instead faced a charge of conspiracy between 1970–72 in the Southern District of New York). This caselaw supports the interpretation of the term "offense" in the rule of specialty as tied to the statutory violation, not to specific facts.

We have never required that the prosecution of an extradited defendant be based on the exact facts as those included in the extradition request. The sole decision Londoño relies upon—one relating to a habeas petition in *Gallo-Chamorro II*—does not hold otherwise.

In *Gallo-Chamorro II*, we found controlling our earlier ruling in the defendant's direct appeal that the government hadn't violated the rule of specialty because the defendant was prosecuted for the crimes for which the foreign country had granted extradition. *See Gallo-Chamorro II*, 233 F.3d at 1305. In the defendant's direct appeal, we considered whether the district court's jury instruction based on *United States v. Pinkerton*[13] violated the doctrine of specialty. *See United States v. Gallo-Chamarro*, 48 F.3d 502, 506 (11th

---

[13] In *United States v. Pinkerton*, the Supreme Court held that co-conspirators may be guilty of the underlying substantive offense even if they joined only the conspiracy if the underlying substantive offense was reasonably foreseeable and committed in furtherance of the conspiracy. *United States v. Pinkerton*, 328 U.S. 640 (1946).

Cir. 1995) ("*Gallo-Chamarro I*"). Colombia, the extraditing country in that case, didn't authorize a *Pinkerton* charge in the indictment because it doesn't have an equivalent crime. *See id.* at 503. Yet we rejected the defendant's rule-of-specialty argument because the defendant "was tried only for the crimes for which he was extradited." *Id.* at 506. *Gallo-Chamarro I* and *II* therefore map onto our case, as Londoño was convicted of the same crime for which he was extradited.

To be sure, in *Gallo-Chamarro II*¸ we said "[r]ather than mandating exact uniformity between the charges set forth in the extradition request and the actual indictment, '[w]hat the doctrine of specialty requires is that the prosecution be based on the same facts as those set forth in the request for extradition.'" *Gallo-Chamarro II*, 233 F.3d at 1305. But our use of the phrase the "same facts" means the same general conduct; it doesn't limit the universe of facts to only those set forth in the request for extradition. Our caselaw shows that additional facts may come into play, and the Government may present them during trial to support the charged offense.

The ultimate question here is "whether [Argentina] would deem the conduct for which [the United States] actually prosecute[d] [Londoño] as interconnected with (as opposed to independent from) the acts for which he was extradited." *United States v. Saccoccia*, 58 F.3d 754, 767 (1st Cir. 1995) (citing *United States v. Andonian*, 29 F.3d 1432, 1435 (9th Cir. 1994), *cert. denied*, 513 U.S. 1128 (1995); *United States v. Cuevas*, 847 F.2d 1417, 1427-28 (9th Cir. 1988),

*cert. denied*, 489 U.S. 1012 (1989); *United States v. Paoutian*, 299 F.2d 486, 490-91 (2d Cir. 1962)). We think the answer can be only that it would.

Under the rule of specialty, "there is no obligation on the requesting state to set forth all its evidence," and "there is no right to object at trial to [the] introduction of evidence that was not part of the request for extradition, so long as the evidence is directed to the charge contained in the request for extradition." Restatement (Third) of Foreign Relations Law of the United States § 477, comment c (1987). The use of additional evidence to support the charge of conspiracy to import cocaine into the United States did not materially alter the offense for which Argentina extradited Londoño. Rather, it supported the Government's theory. And importantly, Londoño was tried on only the offense for which Argentina granted extradition—namely, conspiracy to distribute five kilograms or more of cocaine, knowing that it would be illegally imported into the United States of America.

Because the Government may introduce facts other than those set forth in its extradition request during its prosecution of the case, we reject Londoño's rule-of-specialty argument. The extradition materials do not control the universe of evidence that can be presented at trial.

E.    The Government did not violate its duty to disclose *Brady* material.

Finally, Londoño broadly asserts that the Government's nondisclosure of allegedly exculpatory evidence violated *Brady*. As

a result, Londoño continues, the Government's conduct denied him due process because the allegedly exculpatory documents supported his public-authority and innocent-intent defenses.

*Brady* requires that prosecutors disclose evidence in their possession favorable to the defendant if that evidence is material to guilt or punishment, regardless of the good or bad faith of the prosecution. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963). We measure the obligation to disclose evidence by the probative nature of the evidence. *United States v. Agurs*, 427 U.S. 97, 110 (1976). The Supreme Court has indicated that "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id.* at 109–10.

To establish a *Brady* violation, the defendant must show each of the following four things: "(1) the government possessed evidence favorable to him; (2) the defendant did not possess the evidence and could not have obtained it with reasonable diligence; (3) the government suppressed the favorable evidence; and (4) the evidence was material." *Ponticelli v. Sec'y, Fla. Dep't of Corr.*, 690 F.3d 1271, 1292 (11th Cir. 2012) (citing *Lamarca v. Sec'y, Dep't of Corr.*, 568 F.3d 929, 941 (11th Cir. 2009) (internal quotation marks omitted)). Evidence is material for *Brady* purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." *United States v. Garcia*, 13 F.3d 1464, 1472 (11th Cir. 1994) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A reasonable probability

is one that is sufficient to "undermine confidence in the outcome" of the trial. *Ponticelli*, 690 F.3d at 1292 (citation omitted); *Garcia*, 13 F.3d at 1472.

Londoño points to three broad categories of evidence in support of his *Brady* claim: (1) evidence about ICE/DEA informant Sergio Adame's role in both his and Londoño's cooperation with the Government, (2) evidence about ███████████████████ ████████████████████████, and (3) other materials that the Government never produced.

According to Londoño, the first category of evidence involves two groups of documents that the Government provided to Londoño in unsealed and unredacted form post-trial—in April 2020. The Government had supplied these same documents to Londoño during discovery but with redactions that the district court approved. Londoño contends five emails in this group of documents confirm that confidential informant Sergio Adame was an important figure in securing Londoño's cooperation with the Government. He points to the following:





Londoño's second category of evidence appears to involve one of the same groups of documents as his first category. But the second category includes emails that detail ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████.

The third category of evidence is a catchall for the nondisclosed documents that Londoño believes exist and contain

18-12888                Opinion of the Court                    65

additional *Brady* material based on the documents that the Government disclosed in discovery. According to Londoño, this category of evidence includes the following:



We review *de novo* these alleged *Brady* violations. *United States v. Brester*, 786 F.3d 1335, 1338 (11th Cir. 2015) (citing *United States v. Schlei*, 122 F.3d 944, 989 (11th Cir. 1997)). Upon consideration and review of the unredacted documents, we conclude that

Londoño has not established any *Brady* violations for any of the three categories of evidence.  He has not shown that the Government possessed and withheld favorable evidence or that any evidence it failed to produce was material to Londoño's defenses.  Indeed, no reasonable probability exists that, had the evidence been disclosed, the result of the proceedings would have been different.  *See Ponticelli*, 690 F.3d at 1292.

For starters, the specific documents Londoño identifies—including the first and second categories of documents—contain few or no redactions.  And to the extent those documents were redacted, they reveal that the Government ███████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████.  We note the redactions from each document.

Many of the documents redacted only non-substantive information.  For instance, with respect to document 2—████████ ████████████████████████████████████████████ ████████████████████████████████████.  Similarly, in document 4—██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████.

Other redactions did little more.  In document 3—██ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████.  As for document 1—████████████████



Likewise, the ▮▮▮▮▮▮▮▮▮▮▮▮ (the second category of documents) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As for the other documents about "sensitive subjects" Londoño identifies, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

The only document with substantial redactions was document 5 from the first category—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

We can't say that any of this information was material to Londoño's defense. Indeed, most of the withheld information consists of inconsequential identifying information that does not add

to an understanding or interpretation of the documents. As for the information about Sergio Adame, the Government disclosed that through emails it produced in discovery and through Agent Burrola's testimony during evidentiary hearings and at trial. Various other agents also testified about Adame's involvement as an informant. Plus, the Government called Adame as a rebuttal witness during trial, and Adame testified that he met with defense counsel during trial. Londoño's counsel clearly had a good grasp of Adame's role as a cooperator. ███████████████████████ ██████████████████████████████████████████ The documents contained all other information about him.

Not only that, but with only minor redactions, the Government turned over ██████████████████████████ ██████████████████████████████████ . The jury also heard testimony about Luna's communications with Londoño's attorneys.

And for the most part, the redactions in the documents ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████ .

As for the substantive redactions from the ███████████ ███████████████████████████████████████ . In fact, even though Londoño had access to those documents after trial, he hasn't explained to us how any of this information is favorable to him or how this information is material to his defense.

It's similarly unclear how the redacted document 5 from the first category— ███████████████████████████████████ ████████████████████████████████████████ ██████████ could have materially assisted Londoño's defense.

Finally, as for the third category, Londoño's claims of missing documents, reports, and other information pertaining to Luna, the FBI, and Adame, are entirely speculative. We have no basis to determine that the Government possesses, and failed to disclose, these items. Put simply, Londoño's last category of documents is based on only his unsupported belief that these documents exist. We have long held that "mere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove 'materiality.'" *United States v. Jordan*, 316 F.3d 1215, 1252 n.81 (11th Cir. 2003).

In sum, Londoño has not shown that the Government possessed and withheld any favorable and material evidence. We therefore reject Londoño's *Brady* claim.

### III.   **Conclusion**

For the foregoing reasons, we reject each of Londoño's claims of error and affirm his conviction for conspiracy to distribute five or more kilograms of cocaine with the intent that it be imported into the United States in violation of 21 U.S.C. §§ 959(a)(1), 960(b)(1)(B), and 963.

**AFFIRMED.**